**Joan Lindsey COLEMAN, Individually and as Personal Representative of the Estate of Bradley Vale Lindsey, et al., Appellants,**

v.

**EQUITABLE REAL ESTATE INVESTMENT MANAGEMENT, INC., et al., Appellees.**

No. 05–96–00667–CV.

Court of Appeals of Texas, Dallas.

March 31, 1998.

R. Windle Turley, Tahira Khan Merritt, Law Offices of Windle Turley, P.C., Dallas, Alfred W. Ellis, Dallas, for Appellants.

Frank Finn, Rachelle Hoffman Glazer, Lisa A. Schumacher, Scott Patrick Stolley, Thompson & Knight, P.C., Dallas, for Appellees.

Before LAGARDE, WHITTINGTON and ROACH, JJ.

## OPINION

ROACH, Justice.

In this premises liability case, appellants Joan Lindsey Coleman and Gerald and Nanci Armstrong appeal the trial court's summary judgment in favor of appellees Equitable Real Estate Investment Management Inc. and United Commercial Management, Inc. In two points of error on appeal, appellants complain the trial court erred in concluding, as a matter of law, that (i) appellees owed no duty in this case and (ii) appellees' conduct was not a proximate cause of the injuries suffered. For the reasons set forth below, we overrule both points of error and affirm the trial court's judgment.

### FACTUAL BACKGROUND

On Sunday, April 4, 1994, Brad Vale Lindsey and James Armstrong were working at Blockbuster Video in Casa Linda Shopping Center. Armstrong was the store's assistant manager; Lindsey was a customer service representative. The store, which had been open about one week, closed at midnight. When Lindsey failed to return home after work, his mother went to the store to check on him. The store's lights were on, but the entrance door was locked. Hours later, the police gained entry into the store and found both employees fatally shot. The police impounded a videotape from the store's surveillance cameras that depicted what occurred that night. The videotape had no audio.[1]

The videotape showed that Armstrong, as required by Blockbuster policy, locked the store's doors at midnight. About five minutes later, he checked out the last two customers. After completing the transaction, Armstrong unlocked the exit door, let the customers out, and relocked the exit door. No customers remained in the store. Armstrong then walked around the counter to the door of the entrance vestibule. The door did not have an inside handle, and Armstrong pried it open and unlocked the exterior entrance door. In violation of Blockbuster policy, Armstrong then let in an unidentified man and relocked the door. Armstrong, who "appeared comfortable" with the man, walked with him to the cash register. Both men appeared to take something from the cash register. Lindsey, who had been work-

---

1. Although the summary judgment evidence in the trial court included the videotape, the videotape was not included in the appellate record. Nevertheless, the appellate record contains the affidavits and depositions of various witnesses detailing what was contained on the videotape.

ing in another area of the store when Armstrong let the man in, walked up to the counter where Armstrong and the man were standing. Armstrong and the man stepped out of the diamond-shaped counter into the exit corridor. Lindsey "raise[d] his hands" and then removed something from his pocket and handed it to the assailant. The object appeared to be an envelope.

After that, the man placed Armstrong and Lindsey in front of him and followed them to the back office, where the tape showed the man with a gun for the first time. Armstrong went to the safe, rattled the handle, and shrugged his shoulders, as if he were unable to open the safe. At that point, the tape showed the gunman shoot Armstrong. The tape does not show Lindsey being shot.

The gunman left the office and attempted to leave the store through the entry vestibule. He noticed the door had no handle, circled the diamond-shaped counter, and left the store through the exit door. The gunman was "moving at a very calm, normal pace as if you just paid for a video and walked out of the store." It was determined that about $300 was missing. Some Blockbuster employees speculated that Armstrong knew the assailant.

An earlier portion of the videotape showed that the gunman had been in the store about thirty minutes before closing that night. Armstrong had an armful of tapes and was putting them back on the shelves. The assailant selected a tape and approached Lindsey, who was behind the counter. After an interaction with Lindsey, the assailant put the tape on the counter.

At the time of the incident, Blockbuster did not have in-store security officers and appellees Equitable and United (the shopping center's asset and property managers) provided no security officers in the common areas on Sunday nights. Appellees' security contract provided for one uniformed, unarmed guard to patrol on foot from noon to 7 a.m. Monday through Saturday and from

noon to 6 p.m. on Sunday. The guard was to report daily to the shopping center manager, assist customers with problems such as a stalled car, assist tenants and employees to and from their cars if requested, and watch for any type of safety hazards, mischief, or other activity in the common areas.

The parents of the employees (appellants) sued appellees for negligence, alleging they failed to provide adequate security when they knew or should have known of several prior incidents of criminal activity in the area.[2] Thereafter, appellees moved for summary judgment on the grounds that (i) they owed no duty to the Blockbuster employees because they had no right of control over Blockbuster's operation, i.e, the security of the leased premises and (ii) no acts or omissions by them proximately caused the deaths of the Blockbuster employees. The trial court granted summary judgment in appellees' favor without specifying the basis for its ruling. This appeal ensued.

### STANDARD OF REVIEW

Summary judgment for a defendant is proper only when the defendant negates at least one element of each of the plaintiff's theories of recovery or pleads and conclusively establishes each element of an affirmative defense. *Science Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997). Once the defendant produces evidence entitling it to summary judgment, the burden shifts to the plaintiff to present evidence creating a fact issue. *Walker v. Harris,* 924 S.W.2d 375, 377 (Tex.1996).

In reviewing the granting of a summary judgment, we take as true all evidence favorable to the nonmovant and indulge every reasonable inference in the nonmovant's favor. *Science Spectrum, Inc.,* 941 S.W.2d at 911. When the trial court does not specify the grounds upon which it granted summary judgment, we affirm if any of the movant's grounds support the summary judgment. *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex.

---

**2.** Appellants also sued Blockbuster Entertainment Corporation, Blockbuster Videos, Inc., and Firstwatch Corporation. Firstwatch was the security company for the shopping center at the time of the incident. Appellants settled their claims against the Blockbuster defendants and nonsuited their claims against Firstwatch. This appeal involves only the claims against Equitable and United.

1989); *Texas Stadium Corp. v. Savings of Am.*, 933 S.W.2d 616, 618 (Tex.App.—Dallas 1996, writ denied). If a movant does not show it is entitled to judgment as a matter of law, we must remand the case for a trial on the merits. *Gibbs v. General Motors Corp.*, 450 S.W.2d 827, 828 (Tex.1970); *Texas Stadium Corp.*, 933 S.W.2d at 618.

## DUTY

In the first point of error, appellants complain the trial court erred in granting summary judgment on the basis that appellees owed no duty to provide security to the Blockbuster employees killed inside the store. In particular, appellants argue summary judgment was improper because the summary judgment evidence showed that appellees knew or should have known of prior criminal activity, including violent crime, in the shopping center area. Appellants argue that appellees nevertheless failed to provide any security in the common areas on the night of the murder and thus breached their duty.

■ Appellees counter they had no duty to protect Blockbuster's employees from criminal acts occurring inside the Blockbuster store. They urge any duty they may have had was dependent on control of security of the premises where the crime was committed. Specifically, they contend any duty they may have had to provide security extended only to the common areas of the shopping center. Because they had no control over the security of the Blockbuster premises, they argue they had no duty to prevent the murders in this case. We agree.

The threshold inquiry in a negligence case is whether the defendant owes a legal duty to the plaintiff. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex.1995). The plaintiff must establish both the existence and the violation of a duty owed to the plaintiff by the defendant to establish liability in tort. *Id.* The existence of a duty is a question of law for the court to decide from the facts surrounding the occurrence in question. *Id.*

■ As a general rule, a person has no legal duty to protect another from the criminal acts of third parties or to control the conduct of another. *Walker*, 924 S.W.2d at 377; *Centeq*, 899 S.W.2d at 197. Similarly, a lessor generally has no duty to tenants or their invitees for dangerous conditions on the leased premises. *Johnson County Sheriff's Posse, Inc. v. Endsley*, 926 S.W.2d 284, 285 (Tex.1996); *Holt v. Reproductive Servs., Inc.*, 946 S.W.2d 602, 606 (Tex.App.—Corpus Christi 1997, writ denied). This general rule stems from the notion that a lessor relinquishes possession or occupancy of the premises to the lessee. *Endsley*, 926 S.W.2d at 285; *Holt*, 946 S.W.2d at 606.

■ This general rule, however, is not absolute. One who controls the premises does have a duty to use ordinary care to protect invitees from criminal acts of third parties if he knows or has reason to know of an unreasonable and foreseeable risk of harm to the invitee. *Lefmark Management Co. v. Old*, 946 S.W.2d 52, 53 (Tex.1997); *Centeq*, 899 S.W.2d at 197; *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 21 (Tex.1993). But, as the Texas Supreme Court has emphasized, this duty is commensurate with the right of control over the property. *Lefmark*, 946 S.W.2d at 54; *Exxon*, 867 S.W.2d at 21. Thus, a lessor who retains control over premises used in common by different occupants of his property has a duty to keep those common areas reasonably safe for the tenants and their guests. *Endsley*, 926 S.W.2d at 285; *Holt*, 946 S.W.2d at 606. Likewise, a tenant is responsible for so much of the property as he controls pursuant to his lease. *See Holt*, 946 S.W.2d at 606.

■ As the cases cited above indicate, control is the dispositive factor in determining whether a legal duty should be imposed on appellees in this case. Specifically, we focus on "who had specific control over the safety and security of the premises, rather than on the more general right of control over operations." *Centeq*, 899 S.W.2d at 199; *Exxon*, 867 S.W.2d at 23. Before we will impose a duty against appellees to protect against the criminal acts of third parties, we must find appellees had specific control over the security of the premises where the criminal act took place. *See Centeq*, 899 S.W.2d at 199; *Exxon*, 867 S.W.2d at 23.

Included in appellees' summary judgment evidence was the shopping center lease.[3] Although the lease does not specifically address "security," it does set forth the rights and obligations of each party with respect to the demised premises and common areas. Under the lease, the Casa Linda owners relinquished possession of and control over the Blockbuster premises to Blockbuster for the purpose of selling and renting prerecorded audio and/or video products. With respect to those leased premises, appellees, as property managers, had only a limited right of access. Specifically, article 21 of the lease provided:

Upon reasonable prior notice, but in no event less than twenty-four hours (24) (except in the case of an emergency), Landlord may enter the Demised Premises during Tenant's business hours for purposes of inspection, to show the Demised Premises to prospective purchasers and lenders, or to perform maintenance and repair obligations imposed upon the Landlord by this Lease....

In contrast, appellees retained control over the common areas and were obligated to maintain those areas "in good order and repair." LaRee Stein, director of property management for United, testified that tenants were responsible for the security of their own premises and she stressed that appellees did not maintain keys to its tenants' premises, including Blockbuster.

We conclude this evidence established that appellees had no control over security decisions of the leased premises where the murders occurred. The burden, therefore, shifted to appellants to present some evidence raising a fact issue. Although appellants presented hundreds of pages of deposition testimony and affidavits as summary judgment proof, none of this evidence even remotely suggests that appellees retained any control over the security of the leased Blockbuster store. Instead, appellants rely on appellees' control over the common areas to establish a duty to protect the Blockbuster employees inside the store. We cannot

agree. If appellees did not have any right to control the security of the Blockbuster premises, they cannot have any duty to provide the same. *Exxon*, 867 S.W.2d at 23 ("If Exxon did not have any right to control the security of the station, it cannot have any duty to provide the same."); *cf. Spohn Health Sys. Corp. v. Silva*, 960 S.W.2d 654, 654, 41 Tex. Sup.Ct. J. 149, 149 (Dec. 4, 1997) (per curiam) (disapproving language in court of appeals's decision to extent it implied person has control of non-owned premises merely because that person owns adjacent property).

The murders in this case did not occur on the portion of the premises over which appellees retained control of security decisions, i.e., the common areas. Rather, the criminal conduct occurred inside the locked Blockbuster store, an area over which Blockbuster had specific control of security. Under such circumstances, we cannot conclude appellees had a duty to protect Blockbuster employees from criminal acts occurring inside the store once it was closed and locked. Accordingly, we overrule the first point of error.

### PROXIMATE CAUSE

■ Even assuming appellees owed a duty to appellants and breached that duty, we would nevertheless conclude summary judgment was proper because there was no proximate cause in this case. In Texas, proximate cause involves two distinct elements: cause-in-fact and foreseeability. *See Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 549 (Tex.1985); *Benser v. Johnson*, 763 S.W.2d 793, 795 (Tex.App.—Dallas 1988, writ denied). The term "cause-in-fact" contemplates that the defendant's negligent act or omission was a substantial factor in bringing about the plaintiff's injury and without it no harm would have occurred. *See Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex.1992) (op. on reh'g); *Nixon*, 690 S.W.2d at 549. Foreseeability means that the actor, as a person of ordinary intelligence, should have anticipated the dangers his negligent

---

3. The lease was between Equitable Life Assurance Society of the United States, Mutual of America Life Insurance Company, CLDT Corporation, and Equitable Variable Life Insurance

Company, as tenants in common, and Blockbuster Videos, Inc., as tenant. Appellees acted as the owners' delegates to manage the property.

act created for others. *Nixon,* 690 S.W.2d at 549–50; *Berly v. D & L Sec. Servs., & Investigations, Inc.,* 876 S.W.2d 179, 182–83 (Tex. App.—Dallas 1994, writ denied). Foreseeability does not require the actor to anticipate the precise manner in which an injury will occur; it only requires that (i) the injury be of such a general character as might reasonably have been anticipated, and (ii) the injured party be so situated with relation to the wrongful act that injury to him or to one similarly situated might reasonably have been foreseen. *Berly,* 876 S.W.2d at 183.

There can be more than one proximate cause of an injury, and all persons whose negligent conduct contributed to the injury are responsible for it. *See Travis,* 830 S.W.2d at 98; *El Chico Corp. v. Poole,* 732 S.W.2d 306, 313 (Tex.1987); *see also Bel–Ton Elec. Serv., Inc. v. Pickle,* 877 S.W.2d 789, 795 (Tex.App.—Dallas 1994) (recognizing there can be concurrent proximate causes of accident), *rev'd on other grounds,* 915 S.W.2d 480 (Tex.1996); *Berly,* 876 S.W.2d at 182. Although proximate cause is typically a question of fact, the lack of it may be established as a matter of law where the circumstances are such that reasonable minds cannot arrive at a different conclusion. *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471–72 (Tex.1991); *Bel–Ton,* 877 S.W.2d at 795.

In their summary judgment motion, appellees argued Armstrong's security breach was an unforeseeable act that destroyed any causal connection between their negligence and the employees' deaths. We agree.

Texas courts distinguish between a new and independent cause, which destroys the causal connection between the original negligent act or omission and the complained-of injury, and a "concurrent act," which cooperates with the still-persisting original act in proximately causing the injury and is itself a proximate cause of the injury. *See Boorhem–Fields, Inc. v. Burlington Northern R.R. Co.,* 884 S.W.2d 530, 536 (Tex. App.—Texarkana 1994, no writ) (citing *Bell v. Campbell,* 434 S.W.2d 117, 122 (Tex.1968)). In determining whether the later negligent act is, in fact, a new and independent cause, Texas courts focus on the foreseeability of the intervening party's actions. *See Aeros-*

*patiale Helicopter Corp. v. Universal Health Servs., Inc.,* 778 S.W.2d 492, 497 (Tex.App.—Dallas 1989, writ denied), *cert. denied,* 498 U.S. 854, 111 S.Ct. 149, 112 L.Ed.2d 115 (1990). If the cause could have been foreseen, it does not "break" the chain of causation and relieve the original tortfeasor of liability. *See Northwest Mall, Inc. v. Lubri–Lon Int'l, Inc.,* 681 S.W.2d 797, 803–04 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). As stated in *Aerospatiale:*

> In applying the test of foreseeability to situations where a negligently created pre-existing condition combines with a later act of negligence causing an injury, there is a distinction between a situation in which one has created a dangerous condition and a later actor observes, or by the circumstances should have observed, the existence of the dangerous condition and a situation in which the dangerous condition is not apparent and cannot be observed by the actor. In regard to the first situation, the intervening act interrupts the natural sequence of the events and cuts off the legal effect of the negligence of the initial actor. This is based upon the premise that it is not reasonable to foresee or expect that one who actually becomes cognizant of a dangerous condition in ample time to avert the injury will fail to do so.

*Aerospatiale,* 778 S.W.2d at 497 (quoting *Wolf v. Friedman Steel Sales, Inc.,* 717 S.W.2d 669, 673 (Tex.App.—Texarkana 1986, writ ref'd n.r.e.)).

In *Aerospatiale,* this Court considered the issue of proximate cause in the crash of a twin-engine helicopter. After take-off, the helicopter's engine cowling (or cover) separated from the aircraft and snagged a coiled steel cable, essentially leaving the aircraft operating with one engine. The pilot, however, ignored procedures in the operator's flight manual and bypassed an additional safety feature, which resulted in the helicopter crashing. We concluded the pilot's actions in this regard were unforeseeable by the helicopter's manufacturer and concluded that the separation of the cowling was not, as a matter of law, a proximate cause of the crash.

Likewise, we conclude Armstrong's act was an unforeseeable event that was of such

a nature as to break the natural sequence of events and create a new and independent cause in this case. According to James McCoy, the Blockbuster store manager at the time of the murders, the Blockbuster entrance and exit doors were to be locked at midnight. If there were customers remaining in the store, McCoy testified that an employee would check them out, unlock the door so the customers could leave, and then relock the door. Additionally, Blockbuster policy prohibited allowing anyone to be let into the store once the doors were locked. Armstrong had been trained with respect to this policy. Further, according to McCoy, he and Armstrong had discussed that very policy earlier on the day of the murder, and McCoy reiterated that no one was allowed in the store after midnight.

In this case, the evidence shows that Armstrong followed policy and locked the Blockbuster doors at midnight. After that, however, Armstrong went around the vestibule, pried open the interior entrance door, unlocked the exterior entrance door, and opened it to allow an unidentified man to enter the store. This deliberate violation of safety policy is simply extraordinary in light of the fact that Armstrong had been told that same day not to open the doors after midnight. In essence, Armstrong opened the doors to a locked store late at night, after hours, knowing that an undetermined amount of cash was on hand. In so doing, he defeated the very purpose of the policy put in place for his and other employees' safety. If Armstrong had followed prescribed safety policy, the assailant would not have been able to gain access to the store and the murders inside the store would not have occurred. Under these circumstances, we conclude Armstrong's actions were not foreseeable to appellees and were of such a character as to break the natural sequence of events, thereby creating a new and independent cause. We conclude the trial court properly granted summary judgment to appellees.

We affirm the trial court's judgment.