Sena **THOMPSON, Individually and as Representative and Heir of the Estate of Omar J. Aycox, Appellant,**

v.

**CPN PARTNERS, L.P.; Premium Assets, Inc.; and Whelan Security of Texas, L.L.C., Appellees.**

No. 03–99–00663–CV.

Court of Appeals of Texas, Austin.

April 13, 2000.

Edward J. Hennessy, Hennessy, Gardner & Barth, Houston, for Appellant.

John Kevin Leach, Houston, for Whelan Security.

Gregory R. Ave, Touchstone Bernays Johnson Beall & Smith, L.L.P., Dallas, for CPN Partners.

Samuel Edward Dunn, Houston, for Premium.

Before Chief Justice ABOUSSIE, Justices KIDD and B. A. SMITH.

BEA ANN SMITH, Justice.

In December 1996, CPN Partners, L.P. (CPN) owned the Commerce Park North shopping center (Commerce Park) in north Houston, Texas. Premium Assets, Inc. (Premium) managed and operated Commerce Park as CPN's agent. Whelan Security of Texas, L.L.C. (Whelan) contracted with Premium to provide security services for Commerce Park. Omar Aycox, appellant Sena Thompson's twenty-two year-old son, was an employee of an American Multi–Cinema, Inc. (AMC) movie theater located in Commerce Park, the premises of which AMC leased from CPN. Aycox was shot and killed during a robbery of the theater. There was no security guard inside the theater; Denisha Holmes, an unarmed Whelan security guard, was patrolling the Commerce Park parking lot.

Thompson sued CPN, Whelan, and Premium (appellees), Marvin F. Poer & Co. (Poer), and Holmes, alleging their negligence proximately caused Aycox's death. CPN, Premium, and Whelan moved for summary judgment on the grounds that they owed no duty to Aycox. The district court signed orders granting summary judgment for appellees, including in one a Mother Hubbard clause that effectively granted summary judgment for the two non-moving defendants as well. Thompson appeals, claiming the district court erred (1) in granting summary judgment in favor of Poer and Holmes, who did not move for summary judgment, and (2) in granting summary judgment for the three movants, who owed and breached duties to Aycox. We will affirm in part and reverse and remand in part.

### Did the district court err by granting more relief than was requested?

Thompson sued CPN, Premium, Whelan, Poer, and Holmes. In her original petition, Thompson requested service of citation be effected on CPN, Premium, Whelan, and Poer. As for Holmes, the petition stated "service of citation is not requested at this time." Answers filed by CPN, Premium, and Whelan appear in the appellate record. It does not appear that Holmes was served or that Poer ever answered; the record does not indicate whether Poer was actually served.

CPN, Premium, and Whelan each filed a separate motion for summary judgment. On July 30, 1999, the district court signed three separate orders granting judgment for the individual appellees. Premium's

order included a Mother Hubbard clause reading, "All relief not expressly granted in this Order is denied." Thompson complains that the inclusion of the Mother Hubbard clause erroneously granted summary judgment for Holmes and Poer. We agree.

 An order granting summary judgment including a Mother Hubbard clause is treated as a final order for purposes of appeal. *See Bandera Elec. Coop., Inc. v. Gilchrist,* 946 S.W.2d 336, 337 (Tex. 1997). This is true even when the order arises out of a motion for partial summary judgment. *See id.* When a trial court grants more relief than requested by signing an order that but for a Mother Hubbard clause would grant partial summary judgment, that order is final and appealable, although erroneous. *See id.; Page v. Geller,* 941 S.W.2d 101, 102 (Tex.1997). We treat such an order as final and appealable, consider all matters raised on appeal, and reverse only the portions of the order that were rendered in error. *See Page,* 941 S.W.2d at 102.

 Appellees' motions for summary judgment each requested judgment only for the movant. Holmes and Poer were not parties to any of the motions for summary judgment. The inclusion of the Mother Hubbard clause erroneously granted Premium more relief than it requested in its motion. *See id.; Lee v. El Paso County,* 965 S.W.2d 668, 671 (Tex.App.— El Paso 1998, pet. denied). We reverse the portion of the district court's judgment disposing of claims not addressed in the motions for summary judgment and re-mand the cause for further proceedings on Thompson's claims against Holmes and Poer.

### Did the district court err in granting summary judgment for appellees?

To be entitled to summary judgment, a movant must establish that there are no genuine issues of fact and that it is entitled to judgment as a matter of law. *See Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471 (Tex.1991). A defendant seeking summary judgment must either negate as a matter of law at least one element of each of the plaintiff's theories of recovery or plead and prove as a matter of law each element of an affirmative defense. *See Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex.1995). If the defendant produces evidence establishing its right to summary judgment, the burden shifts to the plaintiff to present evidence raising a fact issue. *See id.* In reviewing the granting of summary judgment, we take as true all evidence favorable to the non-movant and indulge all reasonable inferences in her favor. *See id.*

 A plaintiff bringing a negligence suit must establish both the existence and the violation of a duty owed by the defendant to the plaintiff. *See id.* Whether a defendant owes a duty is a question of law. *See Lefmark Management Co. v. Old,* 946 S.W.2d 52, 53 (Tex.1997); *Centeq Realty,* 899 S.W.2d at 197; *Coleman v. Equitable Real Estate Inv. Management, Inc.,* 971 S.W.2d 611, 615 (Tex.App.—Dallas 1998, pet. denied).[1] Generally, a person has no

---

1. Thompson attacks *Coleman,* arguing it wrongly treats inadequate-security causes of action as standard premises-defect causes of action and uses an artificial distinction between leased premises and common areas. She argues better reasoning is found in *Cain v. Timberwalk Apartments Partner, Inc.,* 942 S.W.2d 697 (Tex.App.—Houston [14th Dist.] 1997), *rev'd on other grounds,* 972 S.W.2d 749 (Tex.1998). Initially, we note that *Cain* concerned a residential apartment landlord's duty to provide security measures to protect its tenants, whereas this case, like *Coleman,* concerns a commercial landlord's duties to its commercial tenants and those tenants' employees. *See Coleman,* 971 S.W.2d at 616; *Cain,* 942 S.W.2d at 699. The *Coleman* landlord retained a right of access to the leased property on twenty-four hours notice or in an emergency for inspections, showing the property to prospective renters, or maintenance and repairs, and the landlord retained control over the common areas, but did not retain sufficient control over the leased premises to give rise to a duty to the tenant's employees.

duty to protect another from a third party's criminal acts. *See Centeq Realty*, 899 S.W.2d at 197; *Coleman*, 971 S.W.2d at 615. One exception to this rule holds that a landlord who retains control over the safety and security of rented premises must use ordinary care to protect its tenant's employees against an unreasonable and foreseeable risk of harm from third parties' criminal acts. *See Centeq Realty*, 899 S.W.2d at 197; *Coleman*, 971 S.W.2d at 615. Therefore, the landlord's right to control the premises is one of the factors that determines whether the landlord owes a duty to the tenant's employees. *See Centeq Realty*, 899 S.W.2d at 197; *Coleman*, 971 S.W.2d at 615. Our inquiry asks "who had specific control over the security of the premises" where the criminal act occurred. *Centeq Realty*, 899 S.W.2d at 199; *see Lefmark Management*, 946 S.W.2d at 53–54. A party not in control of the premises at the time of injury may still owe a duty to use due care to make the premises safe if it agrees to make safe a known dangerous condition on the property. *See Lefmark Management*, 946 S.W.2d at 54. Similarly, a landlord without control over the premises may be liable if it leases the premises with knowledge of an unreasonable risk of harm from criminal intrusions. *See Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 21 (Tex.1993).

Each appellee argues it had no control over security in the leased premises and therefore owed no duty to Aycox. Thompson contends she presented evidence in response to appellees' motions for summary judgment that raised a fact question as to whether each appellee had such a duty. She claims the evidence indicates

CPN and Premium intended to retain control over security for the entire premises, including leased properties, thus giving rise to a duty to protect AMC's employees. Whelan, she argues, had a contractual duty to patrol the entire property and to make security recommendations to CPN and Premium.

*Appellees' summary judgment evidence*

As evidence that they had no duty to Aycox, all three appellees pointed to the contract under which Whelan agreed to provide security services at Commerce Park (the security contract) and the lease under which AMC took control of the theater premises (AMC's lease). In the security contract, Whelan agreed to "[p]rovide unarmed guard services" from 6:00 p.m. to 6:00 a.m., Monday through Friday, and from 12:00 p.m. to 6:00 a.m. on Saturdays and Sundays. The contract does not set out which areas of Commerce Park were to be patrolled.

AMC's lease defines "common facilities" as including "parking areas, streets, driveways, curb cuts, access facilities, aisles, sidewalks, malls, landscaped areas, lighting and other common and service areas" within Commerce Park. AMC agreed to pay a "common area charge" as partial reimbursement to CPN for "common area expenses," which were defined as CPN's costs of "maintaining, repairing, insuring, lighting, protecting and securing the Common Facilities on the Entire Premises...." CPN's access to AMC's leased premises is restricted as follows:

> Tenant shall permit Landlord and the authorized representatives of Landlord to enter Tenant's Building at all reason-

---

*See Coleman*, 971 S.W.2d at 616. The parties' relationships in *Coleman* are much more on par with our case than those in *Cain*.

Further, in reversing the court of appeals' in *Cain*, the supreme court stated, "A complaint that a landowner failed to provide adequate security against criminal conduct is ordinarily a premises liability claim.... Cain asserts that defendants' failure to provide adequate security measures created an unreasonable risk of harm that defendants knew or

should have known about and yet failed to correct. This is a premises liability claim ." *Cain*, 972 S.W.2d at 753.

Thompson's claim that *Cain* should control over *Coleman* is unpersuasive. Likewise unpersuasive is her attempt to distinguish *Coleman* from the case at bar by arguing that the *Coleman* landlord's access to the leased premises was significantly more limited than in our case.

able times for the purposes of (i) serving or posting or keeping posted thereon notices required by law, (ii) conducting periodic inspections, and (iii) performing any work thereon required to be performed by Landlord pursuant to this Lease; provided, however, nothing set forth in this Lease shall be construed as authorizing Landlord to enter the projection booths in Tenant's Building except for a proper business purpose with the consent of the Tenant not to be unreasonably withheld or in the case of an emergency.

The lease's sole reference to security is the statement that a portion of the common area charge would pay for CPN's "protecting and securing" the common areas.

CPN and Premium attached as additional evidence the agreement charging Premium with management and maintenance of Commerce Park in return for a percentage of the property's gross income (the management agreement). Premium undertook to act as CPN's agent in renting and maintaining the premises, employing personnel necessary to operate and maintain Commerce Park, contracting for the provision of "utilities and other services such as water, electricity, gas, telephone, vermin extermination, trash removal, heating, ventilating and air conditioning maintenance, security and other services deemed by [Premium or CPN] to be necessary or advisable for the operation, maintenance or repair of [Commerce Park]," maintaining insurance, collecting rent, preparing budgets and maintaining records, and complying with any legal requirements. Security is mentioned only in reference to contracts with service vendors.

CPN presented as further evidence an affidavit by Max Profesorske, its chief executive officer, stating that on the day of the shooting, CPN did not have possession of the theater and had no responsibility, duty, or authority to provide security within the theater. Whelan presented the affidavit of Gregory Twardowski, Whelan's executive vice-president, which states:

Under the terms of the [security contract], Whelan Security Company, Inc. agreed to provide one unarmed guard to patrol the exterior common areas of [Commerce Park].... On December 10, 1996, an employee of Whelan Security Company, Inc., Denisha Holmes, was present patrolling the parking lot and exterior common areas of [Commerce Park] at all relevant times to this lawsuit, including the time at which Omar J. Aycox was shot and killed. Whelan Security Company, Inc. did not enter into any written or oral agreement with [AMC] to provide security services for the interior of the premises leased by [AMC].... Neither Whelan Security Company, Inc. nor any of its employees had any authority to control or supervise the security or other activities which were occurring within the leased premises of the AMC movie theater.

*Thompson's evidence in response to appellees' motions*

As evidence of a fact question as to each appellee's duty to Aycox, Thompson also produced AMC's lease, the management agreement, and the security contract. She contends that the lease's clause regarding CPN's access to the theater and requirement that AMC pay a common area charge, part of which paid for Whelan's services, evidences CPN's retention of control over security within the theater. She argues that the management agreement, authorizing Premium to bind CPN to security contracts and charging Premium with maintenance of and authority over Commerce Park, indicates CPN and Premium (1) retained control over the entire premises, including leased premises, and (2) undertook to provide security for the entire property, including leased premises. She argues the security contract is ambiguous as to whether Whelan was to patrol leased premises as well as common areas, thereby raising a fact question.

Thompson also produced excerpts from Twardowski's deposition that she claims

contradict his affidavit. Twardowksi testified, "Our customers outline the [security] needs for us, and we staff the contract according to the requirements the customers give us. In other words, we are simply a staffing agency, that is our expertise." He stated the property manager made decisions about the number of guards and the hours during which the property would be patrolled, and said a guard patrolling the property was "a deterrent value for the property." He agreed that patrolling the common areas serves the dual purposes of deterring crime in common areas and trying to deter crime inside leased premises.

Thompson produced portions of the deposition of Patricia Smith, a Premium employee, in which Smith stated that when CPN was investigating buying Commerce Park, Premium reviewed the files with an eye for any security concerns. When CPN bought the property, Premium sent letters to vendors already providing services at Commerce Park, including Whelan, asking them to continue providing services and to sign new contracts. Premium reviewed the service contracts and determined whether the vendors were "acting responsibly or acting professionally in conjunction with them performing their job duties." A Premium employee contacted Whelan and visited Commerce Park and met with on-duty security officers. Smith stated, "Typically, we would turn to the security company for the experience in security, that's why we had a third-party security company." Premium did not hire a security consulting company, nor did Premium employ any former law enforcement personnel. Smith stated the uniformed guard was intended "to be eyes and ears and try to assist in helping deter crime." She said Premium did not actually know if having a security guard would deter crime but that hiring Whelan was an attempt at deterrence. Smith stated that common area fees paid in part for "an adequate security guard" in the common areas. Thompson argues Smith's deposition testimony also contradicts appellees'

evidence. Finally, Thompson produced testimony by the robber who killed Aycox and records of criminal activity at Commerce Park.

*Is the security contract ambiguous?*

 Thompson argues the security contract is ambiguous regarding the areas of Commerce Park to be patrolled by Whelan, thus creating a fact question. *See Lafarge Corp. v. Wolff, Inc.*, 977 S.W.2d 181, 185 (Tex.App.—Austin 1998, pet. denied). Appellees claim the security contract was intended to arrange for one unarmed guard to patrol only the common areas. They deny the contract is ambiguous and instead argue it is silent as to areas intended to be patrolled. *See Sifuentes v. Carrillo*, 982 S.W.2d 500, 504 (Tex.App.—San Antonio 1998, pet. denied); *Medical Towers, Ltd. v. St. Luke's Episcopal Hosp.*, 750 S.W.2d 820, 822 (Tex. App.—Houston [14th Dist.] 1988, writ denied). We agree with appellees that the security contract is not ambiguous.

 A contract is ambiguous if the language used is susceptible of more than one meaning. *See Sifuentes*, 982 S.W.2d at 504; *Lafarge Corp.*, 977 S.W.2d at 185. If a contract is silent as to a particular issue, "the question is not one of interpreting the language but rather one of determining its effect." *Sifuentes*, 982 S.W.2d at 504; *Medical Towers*, 750 S.W.2d at 822. There is a significant legal difference between ambiguous and silent contracts. *See Sifuentes*, 982 S.W.2d at 504. The trial court must determine as a matter of law whether a contract is ambiguous. *See Medical Towers*, 750 S.W.2d at 822. The interpretation of an ambiguous contract is a question of fact. *See Sifuentes*, 982 S.W.2d at 504. An unambiguous contract must be interpreted by the trial court as a matter of law. *See Medical Towers*, 750 S.W.2d at 823. A jury may not be called upon to supply an essential term omitted from the contract and upon which the parties did not mutually agree. *See Sifuentes*, 982 S.W.2d at 504. Evidence of circum-

stances surrounding the execution of an unambiguous contract may be considered to help the court evaluate the parties' intent. *See Medical Towers,* 750 S.W.2d at 823.

The security contract is completely silent as to the areas of Commerce Park intended to be patrolled by Whelan and Premium. Therefore, the question is one of determining what areas the contracting parties intended to have patrolled. The evidence addressing the intended patrol areas is Twardowski's affidavit and deposition testimony, Smith's deposition testimony, and Profesorske's affidavit. In his affidavit, Twardowski stated that Whelan was to patrol only the common areas and had no agreement to provide security within the theater, much less the authority to do so. In his deposition, Twardowski stated he thought Whelan's security services provided "deterrent value to the . . . exterior of the facilities" and agreed that such security was also intended to deter crime inside Commerce Park. However, he did not state Whelan agreed or attempted to provide security within leased premises. Smith said Premium tried to deter crime by having a uniformed security officer in the common areas and that the security guard was always required to be outside patrolling the common areas. Profesorske stated CPN had no responsibility or authority to provide security within the leased theater.

■ Twardowski's and Smith's statements that a guard patrolling the common areas was intended to deter crime within Commerce Park do not contradict appellees' claims that they did not control security within the theater. Nor does Smith's statement that Premium looked to the security company for "experience in security" give rise to an inference that Whelan undertook to make security decisions for the leased premises. We hold the security contract arranged for a guard to patrol the common areas of Commerce Park, not inside the leased premises.

*Did the district court err in granting summary judgment for CPN and Premium?*

■ Without retaining control over AMC's leased premises and security within those premises or agreeing to make safe a known dangerous condition within the theater, CPN and Premium had no duty to protect AMC's employees. *See Lefmark Management,* 946 S.W.2d at 53–54; *Centeq Realty,* 899 S.W.2d at 197; *Coleman,* 971 S.W.2d at 615.

CPN and Premium point to their management agreement, AMC's lease, and the security contract as evidence they had no duty. They argue that the terms of the lease restrict CPN's right to enter the theater premises and give AMC control over the theater and security within it. Thompson argues that the lease, management agreement, and security contract indicate that appellees retained control over or affirmatively agreed to provide security within the leased theater.

The management agreement does not refer to the provision of security or any other service within leased premises, and the security contract indicates appellees arranged for security only in the common areas. The lease does not indicate AMC understood CPN or Premium would provide security inside the theater. AMC's lease allowed CPN or Premium to enter AMC's leased premises only to post notices, perform work due under the lease, or inspect the property; CPN and Premium agreed to provide services to maintain and secure common areas only. These facts do not lead to an inference that CPN or Premium retained sufficient control over the leased premises to give rise to a duty to protect AMC's employees from third parties. Rather, the lease indicates that CPN and Premium had very limited access to AMC's leased premises and no control over security within the theater. *See Coleman,* 971 S.W.2d at 615–16.

■ None of the evidence relied on by Thompson rebuts CPN's and Premium's assertions that they did not retain control

over security within the theater and did not affirmatively assume any such duty.[2] *See Coleman*, 971 S.W.2d at 616. The deposition excerpts provided by Thompson, while indicating appellees hoped a guard in the common areas would deter crime inside Commerce Park, do not indicate that appellees intended to have control over the theater or security within it.

The statistics showing criminal activity at Commerce Park do not indicate that CPN or Premium leased the theater to AMC with knowledge of an unreasonable risk of harm from criminal intrusions. *See Tidwell*, 867 S.W.2d at 21. In the four years preceding Aycox's death, law enforcement responded to four reports of aggravated robbery and one report of an assault at Commerce Park; three of those five, the assault and two robberies, reportedly occurred in past Decembers. It is not clear whether those reported crimes occurred in the theater, common areas, or other leased premises. The statistics do not indicate appellees knew of an unreasonable risk of harm from criminal activity occurring in December or any other month. *See Cain*, 972 S.W.2d at 759 (rape in plaintiff's apartment unforeseeable when, in past ten years, crimes on property or in immediate vicinity consisted of one tire-slashing, one car burglary, one car theft, one sexual assault in one-mile radius, and six assaults in neighboring apartments); *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 551 (Tex.1985) (rape in vacant apartment foreseeable because of "litany of prior crimes, including other violent and assaultive crimes" at complex).

Thompson has not rebutted appellees' showing that Whelan was to patrol only the common areas and that CPN and Premium did not retain control over security within the theater. CPN and Premium established as a matter of law that they owed no duty to Aycox. The district court properly granted summary judgment for CPN and Premium.

*Did the district court err in granting summary judgment for Whelan?*

Neither the security contract nor Twardowski's or Smith's testimony excerpts indicate that Whelan assumed any responsibility for providing security within the AMC theater. Whelan established that it maintained no control over security within the theater and that it did not assume any responsibility to do so. Thompson has not produced evidence to overcome Whelan's evidence that it owed no duty to Aycox. The district court properly granted summary judgment for Whelan.

## Conclusion

Due to our disposition of Thompson's first and second issues on appeal, we need not consider her third and fourth issues. Having determined the district court properly found appellees owed no duty to Aycox, we affirm the orders granting summary judgment for CPN and Whelan, and we affirm the Premium order as far as it grants summary judgment for Premium. We reverse the district court's Premium order as far as it purports to dispose of claims not addressed in appellees' motions for summary judgment, and we remand the cause for further proceedings on Thompson's remaining causes.

---

2. In support of her argument, Thompson also relies on testimony of the man who killed Aycox, in which he states he would not have attempted the robbery had there been a police presence in the theater or perhaps in the parking lot. The robber's motivation in choosing the theater as a target adds nothing to Thompson's argument that appellees had a duty to Aycox; such testimony would be helpful only to a discussion of the robbery's foreseeability once it was established that appellees exercised sufficient control to give rise to a duty to Aycox.