TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-99-00663-CV






Sena Thompson, Individually and as Representative and Heir of the


Estate of Omar J. Aycox, Appellant



v.



CPN Partners, L.P.; Premium Assets, Inc.; and Whelan Security


of Texas, L.L.C., Appellees






FROM THE DISTRICT COURT OF HARRIS COUNTY, 113TH JUDICIAL DISTRICT


NO. 98-13413, HONORABLE PATRICIA ANN HANCOCK, JUDGE PRESIDING






 In December 1996, CPN Partners, L.P. (CPN) owned the Commerce Park North
shopping center (Commerce Park) in north Houston, Texas. Premium Assets, Inc. (Premium)
managed and operated Commerce Park as CPN's agent. Whelan Security of Texas, L.L.C.
(Whelan) contracted with Premium to provide security services for Commerce Park. Omar
Aycox, appellant Sena Thompson's twenty-two year-old son, was an employee of an American
Multi-Cinema, Inc. (AMC) movie theater located in Commerce Park, the premises of which AMC
leased from CPN. Aycox was shot and killed during a robbery of the theater. There was no
security guard inside the theater; Denisha Holmes, an unarmed Whelan security guard, was
patrolling the Commerce Park parking lot.

 Thompson sued CPN, Whelan, and Premium (appellees), Marvin F. Poer & Co.
(Poer), and Holmes, alleging their negligence proximately caused Aycox's death. CPN,
Premium, and Whelan moved for summary judgment on the grounds that they owed no duty to
Aycox. The district court signed orders granting summary judgment for appellees, including in
one a Mother Hubbard clause that effectively granted summary judgment for the two non-moving
defendants as well. Thompson appeals, claiming the district court erred (1) in granting summary
judgment in favor of Poer and Holmes, who did not move for summary judgment, and (2) in
granting summary judgment for the three movants, who owed and breached duties to Aycox. We
will affirm in part and reverse and remand in part.


Did the district court err by granting more relief than was requested?


 Thompson sued CPN, Premium, Whelan, Poer, and Holmes. In her original
petition, Thompson requested service of citation be effected on CPN, Premium, Whelan, and
Poer. As for Holmes, the petition stated "service of citation is not requested at this time." 
Answers filed by CPN, Premium, and Whelan appear in the appellate record. It does not appear
that Holmes was served or that Poer ever answered; the record does not indicate whether Poer
was actually served.

 CPN, Premium, and Whelan each filed a separate motion for summary judgment. 
On July 30, 1999, the district court signed three separate orders granting judgment for the
individual appellees. Premium's order included a Mother Hubbard clause reading, "All relief not
expressly granted in this Order is denied." Thompson complains that the inclusion of the Mother
Hubbard clause erroneously granted summary judgment for Holmes and Poer. We agree.

 An order granting summary judgment including a Mother Hubbard clause is treated
as a final order for purposes of appeal. See Bandera Elec. Coop., Inc. v. Gilchrist, 946 S.W.2d
336, 337 (Tex. 1997). This is true even when the order arises out of a motion for partial
summary judgment. See id. When a trial court grants more relief than requested by signing an
order that but for a Mother Hubbard clause would grant partial summary judgment, that order is
final and appealable, although erroneous. See id.; Page v. Geller, 941 S.W.2d 101, 102 (Tex.
1997). We treat such an order as final and appealable, consider all matters raised on appeal, and
reverse only the portions of the order that were rendered in error. See Page, 941 S.W.2d at 102. 

 Appellees' motions for summary judgment each requested judgment only for the
movant. Holmes and Poer were not parties to any of the motions for summary judgment. The
inclusion of the Mother Hubbard clause erroneously granted Premium more relief than it
requested in its motion. See id.; Lee v. El Paso County, 965 S.W.2d 668, 671 (Tex. App.--El
Paso 1998, pet. denied). We reverse the portion of the district court's judgment disposing of
claims not addressed in the motions for summary judgment and remand the cause for further
proceedings on Thompson's claims against Holmes and Poer.


Did the district court err in granting summary judgment for appellees?


 To be entitled to summary judgment, a movant must establish that there are no
genuine issues of fact and that it is entitled to judgment as a matter of law. See Lear Siegler, Inc.
v. Perez, 819 S.W.2d 470, 471 (Tex. 1991). A defendant seeking summary judgment must either
negate as a matter of law at least one element of each of the plaintiff's theories of recovery or
plead and prove as a matter of law each element of an affirmative defense. See Centeq Realty,
Inc. v. Siegler, 899 S.W.2d 195, 197 (Tex. 1995). If the defendant produces evidence
establishing its right to summary judgment, the burden shifts to the plaintiff to present evidence
raising a fact issue. See id. In reviewing the granting of summary judgment, we take as true all
evidence favorable to the non-movant and indulge all reasonable inferences in her favor. See id.

 A plaintiff bringing a negligence suit must establish both the existence and the
violation of a duty owed by the defendant to the plaintiff. See id. Whether a defendant owes a
duty is a question of law. See Lefmark Management Co. v. Old, 946 S.W.2d 52, 53 (Tex. 1997);
Centeq Realty, 899 S.W.2d at 197; Coleman v. Equitable Real Estate Inv. Management, Inc., 971
S.W.2d 611, 615 (Tex. App.--Dallas 1998, pet. denied). (1) Generally, a person has no duty to
protect another from a third party's criminal acts. See Centeq Realty, 899 S.W.2d at 197;
Coleman, 971 S.W.2d at 615. One exception to this rule holds that a landlord who retains control
over the safety and security of rented premises must use ordinary care to protect its tenant's
employees against an unreasonable and foreseeable risk of harm from third parties' criminal acts. 
See Centeq Realty, 899 S.W.2d at 197; Coleman, 971 S.W.2d at 615. Therefore, the landlord's
right to control the premises is one of the factors that determines whether the landlord owes a duty
to the tenant's employees. See Centeq Realty, 899 S.W.2d at 197; Coleman, 971 S.W.2d at 615. 
Our inquiry asks "who had specific control over the security of the premises" where the criminal
act occurred. Centeq Realty, 899 S.W.2d at 199; see Lefmark Management, 946 S.W.2d at 53-54. A party not in control of the premises at the time of injury may still owe a duty to use due
care to make the premises safe if it agrees to make safe a known dangerous condition on the
property. See Lefmark Management, 946 S.W.2d at 54. Similarly, a landlord without control
over the premises may be liable if it leases the premises with knowledge of an unreasonable risk
of harm from criminal intrusions. See Exxon Corp. v. Tidwell, 867 S.W.2d 19, 21 (Tex. 1993).

 Each appellee argues it had no control over security in the leased premises and
therefore owed no duty to Aycox. Thompson contends she presented evidence in response to
appellees' motions for summary judgment that raised a fact question as to whether each appellee
had such a duty. She claims the evidence indicates CPN and Premium intended to retain control
over security for the entire premises, including leased properties, thus giving rise to a duty to
protect AMC's employees. Whelan, she argues, had a contractual duty to patrol the entire
property and to make security recommendations to CPN and Premium.


Appellees' summary judgment evidence

 As evidence that they had no duty to Aycox, all three appellees pointed to the
contract under which Whelan agreed to provide security services at Commerce Park (the security
contract) and the lease under which AMC took control of the theater premises (AMC's lease). 
In the security contract, Whelan agreed to "[p]rovide unarmed guard services" from 6:00 p.m.
to 6:00 a.m., Monday through Friday, and from 12:00 p.m. to 6:00 a.m. on Saturdays and
Sundays. The contract does not set out which areas of Commerce Park were to be patrolled. 

 AMC's lease defines "common facilities" as including "parking areas, streets,
driveways, curb cuts, access facilities, aisles, sidewalks, malls, landscaped areas, lighting and
other common and service areas" within Commerce Park. AMC agreed to pay a "common area
charge" as partial reimbursement to CPN for "common area expenses," which were defined as
CPN's costs of "maintaining, repairing, insuring, lighting, protecting and securing the Common
Facilities on the Entire Premises. . . ." CPN's access to AMC's leased premises is restricted as
follows: 


Tenant shall permit Landlord and the authorized representatives of Landlord to
enter Tenant's Building at all reasonable times for the purposes of (i) serving or
posting or keeping posted thereon notices required by law, (ii) conducting periodic
inspections, and (iii) performing any work thereon required to be performed by
Landlord pursuant to this Lease; provided, however, nothing set forth in this Lease
shall be construed as authorizing Landlord to enter the projection booths in
Tenant's Building except for a proper business purpose with the consent of the
Tenant not to be unreasonably withheld or in the case of an emergency.



The lease's sole reference to security is the statement that a portion of the common area charge
would pay for CPN's "protecting and securing" the common areas.

 CPN and Premium attached as additional evidence the agreement charging Premium
with management and maintenance of Commerce Park in return for a percentage of the property's
gross income (the management agreement). Premium undertook to act as CPN's agent in renting
and maintaining the premises, employing personnel necessary to operate and maintain Commerce
Park, contracting for the provision of "utilities and other services such as water, electricity, gas,
telephone, vermin extermination, trash removal, heating, ventilating and air conditioning
maintenance, security and other services deemed by [Premium or CPN] to be necessary or
advisable for the operation, maintenance or repair of [Commerce Park]," maintaining insurance,
collecting rent, preparing budgets and maintaining records, and complying with any legal
requirements. Security is mentioned only in reference to contracts with service vendors.

 CPN presented as further evidence an affidavit by Max Profesorske, its chief
executive officer, stating that on the day of the shooting, CPN did not have possession of the
theater and had no responsibility, duty, or authority to provide security within the theater. 
Whelan presented the affidavit of Gregory Twardowski, Whelan's executive vice-president, which
states: 


Under the terms of the [security contract], Whelan Security Company, Inc. agreed
to provide one unarmed guard to patrol the exterior common areas of [Commerce
Park]. . . . On December 10, 1996, an employee of Whelan Security Company,
Inc., Denisha Holmes, was present patrolling the parking lot and exterior common
areas of [Commerce Park] at all relevant times to this lawsuit, including the time
at which Omar J. Aycox was shot and killed. Whelan Security Company, Inc. did
not enter into any written or oral agreement with [AMC] to provide security
services for the interior of the premises leased by [AMC]. . . . Neither Whelan
Security Company, Inc. nor any of its employees had any authority to control or
supervise the security or other activities which were occurring within the leased
premises of the AMC movie theater.



Thompson's evidence in response to appellees' motions

 As evidence of a fact question as to each appellee's duty to Aycox, Thompson also
produced AMC's lease, the management agreement, and the security contract. She contends that
the lease's clause regarding CPN's access to the theater and requirement that AMC pay a common
area charge, part of which paid for Whelan's services, evidences CPN's retention of control over
security within the theater. She argues that the management agreement, authorizing Premium to
bind CPN to security contracts and charging Premium with maintenance of and authority over
Commerce Park, indicates CPN and Premium (1) retained control over the entire premises,
including leased premises, and (2) undertook to provide security for the entire property, including
leased premises. She argues the security contract is ambiguous as to whether Whelan was to
patrol leased premises as well as common areas, thereby raising a fact question. 

 Thompson also produced excerpts from Twardowski's deposition that she claims
contradict his affidavit. Twardowksi testified, "Our customers outline the [security] needs for us,
and we staff the contract according to the requirements the customers give us. In other words,
we are simply a staffing agency, that is our expertise." He stated the property manager made
decisions about the number of guards and the hours during which the property would be patrolled,
and said a guard patrolling the property was "a deterrent value for the property." He agreed that
patrolling the common areas serves the dual purposes of deterring crime in common areas and
trying to deter crime inside leased premises. 

 Thompson produced portions of the deposition of Patricia Smith, a Premium
employee, in which Smith stated that when CPN was investigating buying Commerce Park,
Premium reviewed the files with an eye for any security concerns. When CPN bought the
property, Premium sent letters to vendors already providing services at Commerce Park, including
Whelan, asking them to continue providing services and to sign new contracts. Premium
reviewed the service contracts and determined whether the vendors were "acting responsibly or
acting professionally in conjunction with them performing their job duties." A Premium
employee contacted Whelan and visited Commerce Park and met with on-duty security officers. 
Smith stated, "Typically, we would turn to the security company for the experience in security,
that's why we had a third-party security company." Premium did not hire a security consulting
company, nor did Premium employ any former law enforcement personnel. Smith stated the
uniformed guard was intended "to be eyes and ears and try to assist in helping deter crime." She
said Premium did not actually know if having a security guard would deter crime but that hiring
Whelan was an attempt at deterrence. Smith stated that common area fees paid in part for "an
adequate security guard" in the common areas. Thompson argues Smith's deposition testimony
also contradicts appellees' evidence. Finally, Thompson produced testimony by the robber who
killed Aycox and records of criminal activity at Commerce Park.


Is the security contract ambiguous?

 Thompson argues the security contract is ambiguous regarding the areas of
Commerce Park to be patrolled by Whelan, thus creating a fact question. See Lafarge Corp. v.
Wolff, Inc., 977 S.W.2d 181, 185 (Tex. App.--Austin 1998, pet. denied). Appellees claim the
security contract was intended to arrange for one unarmed guard to patrol only the common areas. 
They deny the contract is ambiguous and instead argue it is silent as to areas intended to be
patrolled. See Sifuentes v. Carrillo, 982 S.W.2d 500, 504 (Tex. App.--San Antonio 1998, pet.
denied); Medical Towers, Ltd. v. St. Luke's Episcopal Hosp., 750 S.W.2d 820, 822 (Tex.
App.--Houston [14th Dist.] 1988, writ denied). We agree with appellees that the security contract
is not ambiguous.

 A contract is ambiguous if the language used is susceptible of more than one
meaning. See Sifuentes, 982 S.W.2d at 504; Lafarge Corp., 977 S.W.2d at 185. If a contract
is silent as to a particular issue, "the question is not one of interpreting the language but rather
one of determining its effect." Sifuentes, 982 S.W.2d at 504; Medical Towers, 750 S.W.2d at
822. There is a significant legal difference between ambiguous and silent contracts. See
Sifuentes, 982 S.W.2d at 504. The trial court must determine as a matter of law whether a
contract is ambiguous. See Medical Towers, 750 S.W.2d at 822. The interpretation of an
ambiguous contract is a question of fact. See Sifuentes, 982 S.W.2d at 504. An unambiguous
contract must be interpreted by the trial court as a matter of law. See Medical Towers, 750
S.W.2d at 823. A jury may not be called upon to supply an essential term omitted from the
contract and upon which the parties did not mutually agree. See Sifuentes, 982 S.W.2d at 504. 
Evidence of circumstances surrounding the execution of an unambiguous contract may be
considered to help the court evaluate the parties' intent. See Medical Towers, 750 S.W.2d at 823.

 The security contract is completely silent as to the areas of Commerce Park
intended to be patrolled by Whelan and Premium. Therefore, the question is one of determining
what areas the contracting parties intended to have patrolled. The evidence addressing the
intended patrol areas is Twardowski's affidavit and deposition testimony, Smith's deposition
testimony, and Profesorske's affidavit. In his affidavit, Twardowski stated that Whelan was to
patrol only the common areas and had no agreement to provide security within the theater, much
less the authority to do so. In his deposition, Twardowski stated he thought Whelan's security
services provided "deterrent value to the . . . exterior of the facilities" and agreed that such
security was also intended to deter crime inside Commerce Park. However, he did not state
Whelan agreed or attempted to provide security within leased premises. Smith said Premium tried
to deter crime by having a uniformed security officer in the common areas and that the security
guard was always required to be outside patrolling the common areas. Profesorske stated CPN
had no responsibility or authority to provide security within the leased theater. 

 Twardowski's and Smith's statements that a guard patrolling the common areas was
intended to deter crime within Commerce Park do not contradict appellees' claims that they did
not control security within the theater. Nor does Smith's statement that Premium looked to the
security company for "experience in security" give rise to an inference that Whelan undertook to
make security decisions for the leased premises. We hold the security contract arranged for a
guard to patrol the common areas of Commerce Park, not inside the leased premises.


Did the district court err in granting summary judgment for CPN and Premium?

 Without retaining control over AMC's leased premises and security within those
premises or agreeing to make safe a known dangerous condition within the theater, CPN and
Premium had no duty to protect AMC's employees. See Lefmark Management, 946 S.W.2d at
53-54; Centeq Realty, 899 S.W.2d at 197; Coleman, 971 S.W.2d at 615.

 CPN and Premium point to their management agreement, AMC's lease, and the
security contract as evidence they had no duty. They argue that the terms of the lease restrict
CPN's right to enter the theater premises and give AMC control over the theater and security
within it. Thompson argues that the lease, management agreement, and security contract indicate
that appellees retained control over or affirmatively agreed to provide security within the leased
theater. 

 The management agreement does not refer to the provision of security or any other
service within leased premises, and the security contract indicates appellees arranged for security
only in the common areas. The lease does not indicate AMC understood CPN or Premium would
provide security inside the theater. AMC's lease allowed CPN or Premium to enter AMC's
leased premises only to post notices, perform work due under the lease, or inspect the property;
CPN and Premium agreed to provide services to maintain and secure common areas only. These
facts do not lead to an inference that CPN or Premium retained sufficient control over the leased
premises to give rise to a duty to protect AMC's employees from third parties. Rather, the lease
indicates that CPN and Premium had very limited access to AMC's leased premises and no control
over security within the theater. See Coleman, 971 S.W.2d at 615-16.

 None of the evidence relied on by Thompson rebuts CPN's and Premium's
assertions that they did not retain control over security within the theater and did not affirmatively
assume any such duty. (2) See Coleman, 971 S.W.2d at 616. The deposition excerpts provided by
Thompson, while indicating appellees hoped a guard in the common areas would deter crime
inside Commerce Park, do not indicate that appellees intended to have control over the theater or
security within it. 

 The statistics showing criminal activity at Commerce Park do not indicate that CPN
or Premium leased the theater to AMC with knowledge of an unreasonable risk of harm from
criminal intrusions. See Tidwell, 867 S.W.2d at 21. In the four years preceding Aycox's death,
law enforcement responded to four reports of aggravated robbery and one report of an assault at
Commerce Park; three of those five, the assault and two robberies, reportedly occurred in past
Decembers. It is not clear whether those reported crimes occurred in the theater, common areas,
or other leased premises. The statistics do not indicate appellees knew of an unreasonable risk
of harm from criminal activity occurring in December or any other month. See Cain, 972 S.W.2d
at 759 (rape in plaintiff's apartment unforeseeable when, in past ten years, crimes on property or
in immediate vicinity consisted of one tire-slashing, one car burglary, one car theft, one sexual
assault in one-mile radius, and six assaults in neighboring apartments); Nixon v. Mr. Property
Management Co., 690 S.W.2d 546, 551 (Tex. 1985) (rape in vacant apartment foreseeable
because of "litany of prior crimes, including other violent and assaultive crimes" at complex).

 Thompson has not rebutted appellees' showing that Whelan was to patrol only the
common areas and that CPN and Premium did not retain control over security within the theater. 
CPN and Premium established as a matter of law that they owed no duty to Aycox. The district
court properly granted summary judgment for CPN and Premium.


Did the district court err in granting summary judgment for Whelan?

 Neither the security contract nor Twardowski's or Smith's testimony excerpts
indicate that Whelan assumed any responsibility for providing security within the AMC theater. 
Whelan established that it maintained no control over security within the theater and that it did
not assume any responsibility to do so. Thompson has not produced evidence to overcome
Whelan's evidence that it owed no duty to Aycox. The district court properly granted summary
judgment for Whelan.


Conclusion

 Due to our disposition of Thompson's first and second issues on appeal, we need
not consider her third and fourth issues. Having determined the district court properly found
appellees owed no duty to Aycox, we affirm the orders granting summary judgment for CPN and
Whelan, and we affirm the Premium order as far as it grants summary judgment for Premium. 
We reverse the district court's Premium order as far as it purports to dispose of claims not
addressed in appellees' motions for summary judgment, and we remand the cause for further
proceedings on Thompson's remaining causes.



 

 Bea Ann Smith, Justice

Before Chief Justice Aboussie, Justices Kidd and Smith

Affirmed in Part; Reversed and Remanded in Part

Filed: April 13, 2000

Do Not Publish

1.   Thompson attacks Coleman, arguing it wrongly treats inadequate-security causes of action
as standard premises-defect causes of action and uses an artificial distinction between leased
premises and common areas. She argues better reasoning is found in Cain v. Timberwalk
Apartments Partner, Inc., 942 S.W.2d 697 (Tex. App.--Houston [14th Dist.] 1997), rev'd on other
grounds, 972 S.W.2d 749 (Tex. 1998). Initially, we note that Cain concerned a residential
apartment landlord's duty to provide security measures to protect its tenants, whereas this case,
like Coleman, concerns a commercial landlord's duties to its commercial tenants and those
tenants' employees. See Coleman, 971 S.W.2d at 616; Cain, 942 S.W.2d at 699. The Coleman
landlord retained a right of access to the leased property on twenty-four hours notice or in an
emergency for inspections, showing the property to prospective renters, or maintenance and
repairs, and the landlord retained control over the common areas, but did not retain sufficient
control over the leased premises to give rise to a duty to the tenant's employees. See Coleman,
971 S.W.2d at 616. The parties' relationships in Coleman are much more on par with our case
than those in Cain.


 Further, in reversing the court of appeals' in Cain, the supreme court stated, "A complaint
that a landowner failed to provide adequate security against criminal conduct is ordinarily a
premises liability claim. . . . Cain asserts that defendants' failure to provide adequate security
measures created an unreasonable risk of harm that defendants knew or should have known about
and yet failed to correct. This is a premises liability claim." Cain, 972 S.W.2d at 753.


 Thompson's claim that Cain should control over Coleman is unpersuasive. Likewise
unpersuasive is her attempt to distinguish Coleman from the case at bar by arguing that the
Coleman landlord's access to the leased premises was significantly more limited than in our case.
2. In support of her argument, Thompson also relies on testimony of the man who killed
Aycox, in which he states he would not have attempted the robbery had there been a police
presence in the theater or perhaps in the parking lot. The robber's motivation in choosing the
theater as a target adds nothing to Thompson's argument that appellees had a duty to Aycox; such
testimony would be helpful only to a discussion of the robbery's foreseeability once it was
established that appellees exercised sufficient control to give rise to a duty to Aycox.


t and assaultive crimes" at complex).

 Thompson has not rebutted appellees' showing that Whelan was to patrol only the
common areas and that CPN and Premium did not retain control over security within the theater. 
CPN and Premium established as a matter of law that they owed no duty to Aycox. The district
court properly granted summary ju