T.C. Memo. 2017-26

UNITED STATES TAX COURT

BASIC ENGINEERING, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 27691-13.                    Filed February 1, 2017.

<u>L. Don Knight</u> and <u>Aaron P. Lloyd</u>, for petitioner.

<u>Bettina M. Nadler</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, <u>Judge</u>:  In a notice of deficiency dated August 22, 2013, respondent

determined Federal income tax deficiencies of $8,670,933.19 and $266,567.82 and

**[*2]** accuracy-related penalties under section 6662(a) of $1,734,186.64 and $53,313.56 for petitioner's 2009 and 2010 taxable years, respectively.[1]

The issues for decision are whether petitioner is: (1) eligible to account for two of its contracts using the completed contract method of accounting and (2) liable for accuracy-related penalties.

## FINDINGS OF FACT

Some of the facts are stipulated and are so found. The first stipulation of facts and the first supplemental stipulation of facts, and the exhibits attached thereto, are incorporated herein by this reference. Petitioner, Basic Engineering, Inc., was a Texas corporation with its principal place of business in Texas when it timely filed its petition.

I.    Overview of the Parties

Petitioner's primary business is the engineering, designing, procuring, refurbishing, and delivering of crude oil processing and refining systems to customers in the petrochemical industry worldwide. Thomas Balke owned 51% of petitioner and James Smith owned 49%; Mr. Balke and Mr. Smith also owned Basic Equipment, Inc. (Basic Equipment), another Texas corporation, in the same

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*3] respective percentages. Mr. Balke was the president of both corporations during the years in issue. Mr. Balke has over 30 years of experience in working with oil refineries and refinery equipment; his international oil refinery business experience first occurred in 1977.

This case concerns the accounting treatment for tax purposes of two of petitioner's contracts that were ongoing in 2009 and 2010: (1) petitioner's contract with Petromaxx Energy Group GmbH, later known as Petromaxx Energy Group GmbH & Co KG, and later as Tagore Investments S.A. as universal successor (collectively Petromaxx); and (2) petitioner's contract with Amber Energy S.A. (Amber). Since its incorporation in 2004 petitioner has accounted for its long-term contracts using the completed contract method of accounting. Respondent's determinations that petitioner was ineligible to use the completed contract method of accounting for the Petromaxx and Amber contracts led to the deficiencies at issue.

II.  The Petromaxx Contract

A.  Basic Equipment-Petromaxx Agreement

Petitioner and Basic Equipment maintained relationships with salespersons working outside the United States who searched for potential customers on their behalf. In 2004 a salesman contacted a Basic Equipment representative to inform

[*4] him that the international entity Petromaxx was interested in building a small oil refinery in Bulgaria with a 10,000 to 15,000 barrel per day (BPD) crude oil topping unit. Mr. Balke, acting on behalf of Basic Equipment, offered to build Petromaxx a new refinery, but Petromaxx wanted a refinery that was readily available and wanted petitioner to find an existing refinery, disassemble it, and refurbish various parts according to Petromaxx's specifications. The newly refurbished parts would then be reconstructed into a new refinery at Petromaxx's preferred international location.

Representatives for Basic Equipment and Petromaxx visited an existing oil refinery in Nixon, Texas (Nixon refinery), that had equipment similar to the equipment Petromaxx had initially described. After visiting the refinery Basic Equipment made a proposal to refurbish the refinery's parts and sell them to Petromaxx, which would then construct an operating refinery. Basic Equipment and Petromaxx ultimately reached an agreement on December 4, 2005 (Nixon equipment agreement).

Under the terms of the Nixon equipment agreement, Basic Equipment agreed to: design and manufacture one new 10,000 BPD atmospheric crude unit and one reconditioned 17,000 BPD crude topping unit; provide Petromaxx with designs and flow diagrams necessary to operate and perform maintenance on the

[*5] crude units; provide Petromaxx with plant operation manuals; and supervise the commissioning of the crude units once they were assembled. In exchange, Petromaxx agreed to pay Basic Equipment $21.5 million; Petromaxx initially paid Basic Equipment $6,450,000 as a deposit on December 23, 2005.

Early in 2006 Petromaxx determined that it needed to build a larger production capacity refinery than the Nixon refinery could provide and withdrew the previous agreement.

B.      Petitioner-Petromaxx Sale and Purchase Agreement

1.      Background

After determining that the Nixon refinery would not meet its production capacity needs, Petromaxx provided Mr. Balke with new scope of work requirements. In an effort to find a refinery that would meet Petromaxx's production capacity requirements, Mr. Balke and a Petromaxx representative visited a larger refinery with a 50,000 to 55,000 BPD capacity in California (Cenco refinery). After examining the Cenco refinery, Mr. Balke offered to refurbish and sell the refinery's parts to Petromaxx, which would then construct an operating refinery. At some point Mr. Balke made the decision to transfer the

[*6] order from Basic Equipment to petitioner.[2]  Basic Equipment transferred to petitioner Petromaxx's original $6,450,000 Nixon refinery deposit in installments of $3 million on February 8, 2006, $3 million on March 8, 2006, and $450,000 on March 28, 2006.

On March 22, 2006, petitioner purchased the Cenco refinery from JAS Marketing, Inc. (JAS), for $18.9 million for use in the Petromaxx project. Petitioner agreed to make its first payment to JAS on or before March 22, 2006, with subsequent payments due monthly through August 22, 2007.

### 2. Sale and Purchase Agreement

Before executing a formal agreement, Petromaxx transferred to petitioner $10,750,000 in addition to the $6,450,000 deposit Petromaxx paid to Basic Equipment, which was subsequently transferred to petitioner.  The advanced funds were paid to petitioner in two equal installments of $5,375,000 on May 22 and September 1, 2006.

On October 28, 2006, petitioner and Petromaxx executed a "Sale and Purchase Agreement" (Petromaxx SPA) whereby Petromaxx agreed to purchase certain crude oil processing units from petitioner.  The Petromaxx SPA required

---

[2]The exact date on which Mr. Balke made the decision to transfer the order is not in the record.

**[*7]** petitioner to refurbish the oil processing units and to provide Petromaxx with engineering specifications that Petromaxx would use to install the newly refurbished units and construct an operating refinery.[3]  Once the Cenco refinery was broken down and the necessary parts refurbished, petitioner was responsible for delivering the refurbished units to its facility in Houston, Texas, and Petromaxx was responsible for shipping the refurbished units from there to Bulgaria.  Petromaxx was also responsible for creating the refinery site in Bulgaria and erecting and installing the newly refurbished units into a refinery.  Once Petromaxx had erected and installed the refurbished units, petitioner was required to supervise the commissioning[4] of the newly erected units.  Upon successful

_____

[3]Petitioner subcontracted the engineering work to MM Inženjering LTD. (Montmontaza), a subsidiary of Montmontaža PLC, a Croatian company, via an agreement executed by the parties on January 9, 2007 (Montmontaza agreement). Montmontaza was responsible for providing the information that Petromaxx would need to construct the refinery in Bulgaria.  To satisfy its responsibilities, Montmontaza was to produce as-built documentation of the existing Cenco refinery in its standing condition in California and check the then-existing plant configuration against the future Bulgaria refinery site location.  Doing so would allow Montmontaza to produce the documentation that would be necessary for Petromaxx to reconstruct the refurbished Cenco refinery in Bulgaria.

[4]The Petromaxx SPA defined commissioning as "a set of activities that shall be performed by BUYER's personnel as Supervised by BASIC's on site field engineer and witnesses by Qualified Engineer at BUYER's Location in order to determine that the Facility can be properly and safely operated in accordance with the Technical Standards promptly after mechanical completion and pre-commis-

(continued...)

[*8] commissioning of the refinery, a qualified engineer would conduct performance tests and issue a "final acceptance report and certificate" upon successful testing.  At that point, petitioner would have fulfilled all of its obligations under the Petromaxx SPA and Petromaxx would assume full responsibility for the refinery and its operation.  In consideration for a complete, satisfactory, and timely performance by petitioner of all of its obligations under the Petromaxx SPA, Petromaxx agreed to pay petitioner $90.5 million.[5]

The Hardt Investment Group, headquartered in Vienna, Austria, controlled the underlying funding of Petromaxx, and the parties negotiated the following governing law provision in section 19.3.1 of the Petromaxx SPA:

> This Agreement shall be governed by, and construed in accordance with, the laws of the Republic of Austria including the UN Convention on Contracts for the International Sale of Goods of 1980 (CISG).  The Parties' rights and obligations with respect to title to and security interests in the Equipment shall be governed by the law of the jurisdiction in which such Equipment is located.

---

[4](...continued)
sioning of the Facility".

[5]The total contract price included the $17.2 million previously paid to petitioner--the $6,450,000 deposit paid to Basic Equipment (and transferred to petitioner) and the two payments of $5,375,000 paid directly to petitioner.

**[\*9]**          3.     <u>Amendment to Petromaxx SPA</u>

After executing the Petromaxx SPA, Petromaxx once again determined that it wanted to increase the capacity of its refinery. On October 6, 2007, almost one year after the original contract was executed, petitioner and Petromaxx executed an amendment to the Petromaxx SPA whereby petitioner agreed to refurbish additional equipment that would allow Petromaxx to meet its capacity requirements. Petromaxx agreed to pay an additional $31,750,000 to petitioner for the additional equipment, bringing the total contract price to $122,250,000. In October of 2007, at the time the parties executed the amendment to the Petromaxx SPA, Petromaxx had made payments to petitioner totaling $72.4 million.[6]

C.     <u>Timeframe</u>

For purposes of accounting for the Petromaxx contract, petitioner's estimate of the time the contract would take to complete is important. The Court will look to the terms of the Petromaxx SPA and will consider testimony from Mr. Balke and respondent's expert witness, John Harris.

---

[6]The parties executed subsequent amendments to the Petromaxx SPA through August 13, 2008, but the subsequent amendments did not adjust the total contract price.

**[*10]**        1.        Petromaxx SPA

With respect to the Petromaxx project's expected timeframe, section 3.2.2.

of the Petromaxx SPA provided:

> Agreed Project Schedule.  BASIC shall commence * * * [its work] in
> accordance with the project schedule and management plan set forth
> in Exhibit 3.2.2 (the "Preliminary Project Schedule").  Within one (1)
> month after signing this Agreement, BASIC shall submit, for
> BUYER's review and approval, an updated and more detailed
> schedule (as approved by Qualified Engineer and by BUYER, the
> "Agreed Project Schedule") amending the Preliminary Project
> Schedule which sets forth the timing of completing the [Cenco
> refinery] Units and of all other major elements of * * * [petitioner's
> obligations] as well as the interrelationship of such elements.  Dates
> included in the Agreed Project Schedule shall be the best estimates
> available at the time of submission of the Agreed Project Schedule
> but shall not be guaranteed dates of delivery or achievement of listed
> milestones or objectives, except that Delivery of the last [Cenco
> refinery] Unit is guaranteed to occur no later than twelve (12) months
> after the signing of this Agreement.

Exhibit 3.2.2 to the Petromaxx SPA--the "Preliminary Project Schedule"--stated:

"[to be provided by BASIC]"; the rest of the page was blank.  Petitioner did not

introduce into evidence a document purporting to be the preliminary project

schedule that it was to provide or an amended project schedule.

Although the Petromaxx SPA did not contain a project schedule, it required

petitioner to "use its best efforts" to deliver the last refurbished unit to its facility

in Houston, Texas, by April 30, 2007; however, if petitioner failed to deliver the

[*11] last unit by April 30, 2007, the Petromaxx SPA did not provide for penalties.

If petitioner failed to deliver the last unit on or before September 12, 2007,

petitioner would default under the terms of the Petromaxx SPA.[7]  These delivery

dates are the only performance dates specified in the Petromaxx SPA.[8]

---

[7]Specifically, section 3.2.1 of the Petromaxx SPA provided:

BASIC shall use its best efforts to Deliver the [Cenco refinery] Units listed as Phase One and as Phase Two in the Equipment Ledger within five (5) months after signing of this Agreement.  BASIC shall use its best efforts to Deliver all other Units on or prior to the date corresponding to such Unit set forth in the Project Schedule, and in any event on or prior to April 30, 2007.  The failure of BASIC to deliver such Units on the foregoing dates shall not constitute a default under this Agreement unless BASIC fails to use its best efforts. Notwithstanding the foregoing, it shall be a default under this Agreement if BASIC fails to Deliver the last Unit on or prior to September 12, 2007 ("Final Delivery Date").

Section 8.4 of the Petromaxx SPA provided that petitioner "shall diligently pursue the performance of * * * [its work] and will achieve Delivery of all Equipment on or prior to September 12, 2007".

Sections 3.2.1 and 8.4 of the Petromaxx SPA conflict with section 3.2.2 with respect to the delivery of the units, as sections 3.2.1 and 8.4 state that delivery of the last unit will occur on or before September 12, 2007, while section 3.2.2 states that delivery of the last unit will occur no later than 12 months after the signing of the SPA on October 28, 2006.  This inconsistency does not affect the Court's determination with respect to the two-year rule discussed infra.

[8]The Montmontaza agreement also appears to coincide with the delivery timeline specified in the Petromaxx SPA, as Montmontaza anticipated having all drawings and documents completed by the middle of September 2007.

[*12] Importantly, the Petromaxx SPA did not include terms requiring Petromaxx to ship the refurbished units from Houston, Texas, to Bulgaria by a specific date, begin or finish creating the refinery site by a specific date, or begin or finish installing and erecting the newly refurbished units into a refinery by a specific date. Petitioner did not offer into evidence any documentation reflecting dates by which petitioner or Petromaxx expected Petromaxx to begin or finish its obligations.

Section 9.4.1 of the Petromaxx SPA provided: "Immediately after notification that the erection and installation of the * * * [refinery site] has been properly performed and completed, BASIC shall Supervise * * * [Petromaxx's] personnel in Commissioning of the Facility." After successful commissioning, a qualified engineer would conduct performance tests which "must in any case be completed within sixty (60) days, or such other period as may be agreed in writing by the Parties, from the date on which Commissioning has commenced." Once the qualified engineer was satisfied that the performance tests showed that the newly installed and erected refinery met certain standards, he would issue a report. At that point, petitioner would have fulfilled all of its obligations under the Petromaxx SPA. The Petromaxx SPA did not contain an overall project completion date.

**[*13]**  With respect to the terms of payment, the Petromaxx SPA indicates that the parties anticipated the final payment to become due on the earlier of:  (1) 10 months after the "Final Delivery Date", which was September 12, 2007, or (2) the "Final Acceptance Date", which was the date that the qualified engineer issued a completion report.

Because the Petromaxx SPA did not specify dates by which Petromaxx would ship the refurbished units, finish creating the refinery site, or finish installing and erecting the newly refurbished units into a refinery, it is unclear exactly when the parties expected the Petromaxx SPA to be completed.

### 2.    Mr. Balke's Testimony

Mr. Balke testified that 3-D laser scanning technology was introduced to his industry in the early to mid-2000s.  This technology allowed existing refineries to be scanned before their deconstruction and produced blueprints and models of the assembled refineries timelier than the traditional method of measurement and modeling.  These blueprints and models could then be shipped elsewhere to assist in the preparation of the new site for construction.  According to Mr. Balke petitioner was an early adopter of this technology, and he intended petitioner to use it in completion of the Petromaxx SPA.

[*14]  In theory, by using the increased efficiency of the 3-D scanning, multiple stages of the refurbishing and reconstruction processes could proceed in tandem. Mr. Balke used the phrase "parallel processing" to describe this system of operation.  The logistics of this theory operated in the following manner:  Each stage of the dismantling project would be scanned and modeled, and the model would be sent to the purchaser; then, simultaneously, petitioner would begin dismantling and refurbishing the scanned sections of the refinery while the purchaser used the models to prepare the new site for the refinery's specific reconstruction requirements.  Despite the theory's temporal benefits, Mr. Balke testified that he was aware of only two other companies in petitioner's industry currently using a parallel processing system.

### 3.     Respondent's Expert Witness Testimony

Respondent called John R. Harris, PE, to testify as an expert witness on the process of creating, constructing, and operating refineries.  The Court recognized Mr. Harris as such an expert and received into evidence his expert witness report, in which he stated his opinion regarding a reasonable estimate of time it would take to complete the Petromaxx refinery project.

Mr. Harris opined that a three-year timeframe to complete the Petromaxx project was "optimistic but possible."  To arrive at his conclusion, Mr. Harris

[*15] noted that the only performance date specified in the Petromaxx SPA was September 12, 2007, the date by which petitioner was required to deliver the equipment. Because the Petromaxx SPA did not specify dates by which the remaining components of the Petromaxx refinery project would begin and finish, Mr. Harris was required to make assumptions and estimate how long the remaining components would take, which he summarized as follows:

> One must make an estimate of the reasonable time required to ship the equipment, acquire the balance of the equipment, supplies and services necessary to complete a refinery. Foreign shipping to an inland port in the developing world is difficult to estimate. Six months seems like an optimistic period to have everything in place in Bulgaria, assuming no delays in long lead-time equipment, no local shortages of necessary supplies or scarcity of skilled labor. Following Owner acquisition of the equipment, and presuming finished engineering proceeds timely, final erection of the refinery could hardly be expected in less than one year. If commissioning proceeds promptly and few problems are found, this task should take 6 weeks, followed by another month for a performance run on the refinery.

Mr. Harris did not take petitioner's parallel processing system into consideration in reaching his conclusions with respect to the Petromaxx SPA's timeframe. Instead, Mr. Harris' conclusion was based on traditional industry practices, and Mr. Balke agreed with Mr. Harris' conclusion to the extent he had relied on traditional industry practices. Mr. Balke disagreed with Mr. Harris' overall conclusion that the Petromaxx project would take at least three years to

[*16] complete because Mr. Harris did not consider how much time 3-D laser imaging or petitioner's parallel processing system would save.

### D. Project Outcome

Ultimately, the Petromaxx refinery project was not completed. At some point during the course of the project, Petromaxx lost its financing and was unable to pay petitioner. At the time of trial, the dismantled units from the Cenco refinery were still in petitioner's construction yard in Texas.

## III. The Amber Contract

### A. Background

While petitioner was working on the Petromaxx refinery project, a representative from the Hardt Investment Group contacted Mr. Balke to inform him that Amber was interested in purchasing a 100,000 BPD refinery and assembling it in Pakistan. Mr. Balke informed the representative that he was aware of a 100,000 BPD refinery in Turkey (Ataş refinery) that would meet Amber's production capacity requirements. Toplam Mühendislik ve Taahhüt İthalat İhracat Limited Şirketi (Toplam), a company incorporated in Turkey, contracted to supply the Ataş refinery units.[9]

---

[9]Toplam obtained title to the then-existing Ataş refinery units on April 21, 2008. BP, Shell, and Marmara Petrol owned the refinery site and have since

(continued...)

[*17]  B.    Petitioner-Amber Sale and Purchase Agreement

On July 17, 2008, petitioner and Amber executed a "Sale and Purchase Agreement" (Amber SPA).  The Amber SPA required petitioner to identify and negotiate purchase orders with third-party vendors to procure oil processing units for use in the Amber project, refurbish those units, and deliver the newly refurbished units to a designated location.  To satisfy those obligations, petitioner purchased the Ataş refinery units from Toplam for $18 million via a "Supply Agreement" executed on July 24, 2008 (Toplam supply agreement).  Under the terms of the Toplam supply agreement, Toplam agreed to dismantle the Ataş refinery and deliver the dismantled units to a specified location in Turkey in a condition that would allow them to be refurbished on site.  Petitioner then subcontracted with third parties to perform the refurbishing work that was specified in the Amber SPA; the refurbishing work would occur while the Ataş units were at the Ataş refinery site in Turkey.[10]  Upon completion of the work in

---

[9](...continued)
converted the location to an oil products terminal and storage facility.

[10]Although the Toplam supply agreement allowed for the refurbishing work to take place at the Ataş site, the units were ultimately moved to Northern Cyprus and refurbished there.

[*18] Turkey, Amber was responsible for transporting the newly refurbished units to a site in Pakistan.[11]

The Amber SPA required petitioner to obtain a fluid catalytic cracker unit (FCCU)[12] for use in the Amber project.  Petitioner agreed to acquire, dismantle, and transport the FCCU to its Houston, Texas, facility for refurbishing work.  Petitioner purchased an FCCU from a third party in Wichita, Kansas, for use in the Amber project.

The Amber SPA also required petitioner to provide Amber with engineering specifications and drawings that Amber would use to install the newly refurbished units and construct an operating refinery.  Amber was responsible for creating and preparing the refinery site and erecting and installing the newly refurbished units if it elected to do so.[13]  If Amber chose to erect and install the refurbished units, petitioner was required to supervise the commissioning of the newly erected

---

[11]The location at which Amber was to construct a refinery was subject to change at Amber's sole discretion.  The available documentary evidence does not reflect a final location determination.

[12]Fluid catalytic cracking, a type of secondary unit operation, is primarily used in producing additional gasoline in the refining process.

[13]Under the terms of the Amber SPA, Amber was not <u>required</u> to install and erect a refinery.  If Amber elected not to install, erect, and commission the refinery, the total contract price was to be reduced by only $75,000 out of the total contract price of $100 million.

**[\*19]** refinery. Upon successful commissioning of the refinery, a qualified engineer would conduct performance tests and issue a "final acceptance report and certificate" upon successful testing. At that point, petitioner's obligations under the Amber SPA would end and Amber would assume full responsibility for the refinery and its operation. In consideration for a complete, satisfactory, and timely performance by petitioner of all of its obligations under the Amber SPA, Amber agreed to pay petitioner $100 million.

The Amber SPA contained the following governing law provision:

> This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas, including Article 2 of the Uniform Commercial Code, except to the extent that the Parties' rights and obligations with respect to title to and security interests in the Equipment may be governed by the law of the jurisdiction in which such Equipment is located.

### C. Timeframe

For purposes of accounting for the Amber contract, petitioner's estimate of the time the contract would take to complete is important. The Court will look to the terms of the Amber SPA and will consider testimony from Mr. Balke and respondent's expert witness, John Harris.

**[*20]**       1.       Amber SPA

With respect to the Amber SPA's timeframe, section 3.2.1 of the Amber

SPA provided:

> BASIC shall commence * * * [its work] in accordance with the
> Project Schedule and shall use its best efforts to ensure that * * * [its
> work is] performed in accordance with the Project Schedule.  Dates
> included in the Project Schedule are the best estimates available on
> the date of this Agreement but are not guaranteed dates of delivery or
> achievement of listed milestones or objectives, except that Delivery
> of all items comprising the * * * [complete package of crude oil
> processing and refining equipment] is guaranteed to occur no later
> than the Delivery Deadline [November 15, 2010].  Modifications to
> the Project Schedule shall only be made with the prior written
> approval of * * * [Amber].

A project schedule was not attached to the Amber SPA, and petitioner did

not offer into evidence a project schedule or any other documentation that would

reflect dates by which the parties expected the various components of the project

to be completed.

Although the Amber SPA did not contain a project schedule, the agreement

required petitioner to deliver the last unit "no later than" November 15, 2010.

Petitioner was entitled to bonus payments if the delivery date for the units

occurred before November 15, 2010, and subject to penalties if the delivery date

occurred after November 15, 2010.

**[*21]**  Importantly, just like the Petromaxx SPA the Amber SPA did not include terms requiring Amber to ship the refurbished units by a specific date, begin or finish creating the refinery site by a specific date, or begin or finish installing and erecting the newly refurbished units into a refinery by a specific date.  Petitioner did not introduce into evidence any documentation reflecting dates by when petitioner or Amber expected Amber to begin or finish its obligations.

If Amber elected to erect the refinery, petitioner was required to provide at least one field engineer to supervise the commissioning process.  After successful commissioning, a qualified engineer would conduct performance tests which "must in any case be completed within sixty (60) days, or such other period as may be agreed in writing by the Parties, from the date on which Commissioning has commenced."  Once the qualified engineer was satisfied that the performance tests showed that the newly installed and erected refinery met certain standards, he was to issue a report.  At that point, petitioner's obligations under the Amber SPA would end and Amber would assume full responsibility for the refinery and its operation.  The Amber SPA did not specify an overall project completion date.

With respect to the terms of payment, the Amber SPA indicated that the parties anticipated the final payment's becoming due on the earlier of:  (1) 10 months after the "Delivery Date", which was the date on which petitioner

[*22] delivered the refurbished units to its facility in Houston, Texas, or (2) the "Final Acceptance Date", which was the date on which the qualified engineer issued a completion report.[14]

Because the Amber SPA, like the Petromaxx SPA, did not specify dates by when Amber was required to ship the refurbished units, finish creating and preparing the refinery site, or finish installing and erecting the newly refurbished units into a refinery, it is unclear exactly when the parties expected the Amber SPA to be completed.

### 2. Mr. Balke's Testimony

Mr. Balke testified that the Amber refinery project was simpler from a logistics perspective than the Petromaxx refinery project and was likely to be finished faster than Petromaxx, starting from each respective contract's start date. In addition he pointed to the Amber SPA, which refers to the possibility that petitioner would use 3-D laser scanning and modeling. As with the Petromaxx SPA, Mr. Balke's intent was for petitioner to use parallel processing in fulfilling the contract obligations of the Amber SPA.

---

[14]Although the Amber SPA provided for delivery of all units to Houston, Texas, the parties stipulated that petitioner and Amber never intended for the Ataş refinery units to be shipped from Turkey to Houston. See infra note 15.

**[*23]**        3.        Respondent's Expert Witness Testimony

Mr. Harris opined that a 4-1/2-year timeframe to complete the Amber

refinery contract was "optimistic but possible." In arriving at his conclusion, Mr.

Harris noted that the "Amber plant is double the size of the * * * [Petromaxx]

plant, involving more work and time." Mr. Harris also noted that the only

performance date specified in the Amber SPA was with respect to petitioner's

delivery obligations; petitioner was required to deliver the equipment by

November 15, 2010, roughly 28 months after the date on which the Amber SPA

was executed. Because the Amber refinery project did not specify dates by which

the remaining components of the Amber SPA would begin and finish, Mr. Harris

was required to make assumptions and estimate the time it would take to complete

the remaining tasks, which he summarized as follows:

> One must make an estimate of the reasonable time required to ship the equipment, acquire the balance of the equipment, supplies, and services necessary to * * * complete the Amber refinery in Pakistan. Foreign shipping in the developing world is difficult to estimate. Seven months seems like an optimistic period to have everything in place in Pakistan, assuming no delays in long lead-time equipment, no local shortages of necessary supplies or scarcity of skilled labor. Following Owner acquisition of the equipment, and presuming finished engineering proceeds timely, final erection of the refinery could hardly be expected in less than 18 months. If commissioning proceeds promptly, and few problems are found, this task should take

[*24] two months, following by another two months for a performance run on the refinery.[15]

As with the Petromaxx SPA, Mr. Harris' overall conclusion with respect to the Amber SPA's timeframe did not take petitioner's parallel processing system into consideration.

D.    Project Outcome

On the same day that petitioner and Amber executed the Amber SPA they also executed a "Side Letter" to the Amber SPA whereunder the parties agreed that the due date for certain installment payments would be extended because Amber had not yet obtained sufficient financing to effect payment for the installments. After approximately 18 months, on January 18, 2010, the parties agreed to cancel the Amber SPA and release themselves from all responsibilities and liabilities under the SPA's terms. At the time of trial, the FCCU was still in

---

[15]Mr. Harris' opinion was formed, in part, on the basis of moving the Ataş refinery from Turkey and the FCCU from Wichita to petitioner's facility in Houston for cleaning and inspection and then shipping those refurbished parts to Pakistan. While the FCCU unit was to be transported from Wichita to Houston, and then from Houston to Pakistan, the parties stipulated that petitioner and Amber never intended for the dismantled Ataş refinery to be shipped from Turkey to Houston even though delivery to Houston was specified in the Amber SPA. The stipulation was executed by the parties after the filing date of the expert report.

[*25] petitioner's construction yard in Texas, and the Ataş refinery units were still in Northern Cyprus.

IV.    Petitioner's Federal Income Tax Returns

From 2005 to 2010 petitioner accounted for the Petromaxx and Amber contracts using the completed contract method of accounting; each return was prepared and signed by the same certified public accountant (CPA).  A taxpayer using the completed contract method of accounting recognizes all income and expenses associated with a contract only in the contract's completion year.  See sec. 1.460-4(d), Income Tax Regs.  Petitioner's position is that neither contract was completed.  Because petitioner accounted for the contracts using the completed contract method of accounting, it did not report income or expenses associated with either contract during the years at issue or earlier because the contracts were not completed.  Petitioner's schedule of all of its contracts for 2007-2010 was provided to respondent.  This information was not reported on its income tax returns.  The schedules reflected petitioner's annual contract revenue, estimated total contract prices, annual contract expenses, and estimated total contract expenses for the Petromaxx and Amber projects as follows:

[*26]                              Petromaxx project

| Year | Annual revenue | Estimated total contract price | Annual expenses | Estimated total contract expenses |
|---|---|---|---|---|
| Before 2007 | $20,395,917 | $122,250,000 | $16,316,738 | $97,800,000 |
| 2007 | 49,708,361 | 122,250,000 | 39,766,687 | 97,800,000 |
| 2008 | 31,978,623 | 122,250,000 | 25,582,819 | 97,800,000 |
| 2009 | 866,631 | 122,250,000 | 709,295 | 97,800,000 |
| 2010 | 192,707 | 122,250,000 | 154,174 | 97,800,000 |
| Total | $103,142,239 | | $82,529,713 | |

Amber project

| Year | Annual revenue | Estimated total contract price | Annual expenses | Estimated total contract expenses |
|---|---|---|---|---|
| Before 2007 | -- | -- | -- | -- |
| 2007 | -- | -- | -- | -- |
| 2008 | $33,252,634 | $101,000,000 | $26,667,954 | $81,000,000 |
| 2009 | 1,418,775 | 101,000,000 | 1,137,835 | 81,000,000 |
| 2010 | 31,585 | 101,000,000 | 25,325 | 81,000,000 |
| Total | $34,702,994 | | $27,831,114 | |

Respondent determined that petitioner was ineligible to use the completed contract method of accounting for the Petromaxx and Amber SPAs. The notice of deficiency reflected alternative accounting positions for petitioner's projects.

[*27] Under either position, respondent determined that petitioner was not eligible to report income under the completed contract method of accounting. Respondent determined that the Petromaxx SPA should have been reported as a manufacturing contract and that petitioner should have accounted for the Petromaxx SPA using the accrual method of accounting.[16] As his alternative position, respondent determined that petitioner must account for both contracts using the percentage of completion method because petitioner could not have estimated their completion within the two-year period beginning on the respective contract commencement dates. See sec. 460(e).

As discussed infra, the determination of whether either contract is a manufacturing contract or a construction contract is irrelevant because the section 460 default provision applies. Thus, the following facts and calculations are derived from respondent's alternative position, i.e., that petitioner was required to account for both contracts using the percentage of completion method.[17]

---

[16]Although respondent's pretrial memorandum asserts that both the Petromaxx and Amber contracts are manufacturing contracts, the notice of deficiency determines that only the Petromaxx contract is a manufacturing contract. Respondent did not amend his answer to assert otherwise.

[17]Because the deficiency and penalty amounts reflected on the face of the notice of deficiency are based on respondent's primary position, the adjustments discussed infra will not match the deficiency and penalty amounts reflected on the

(continued...)

[*28]  The percentage of completion method of accounting requires taxpayers to recognize income and expenses throughout the duration of a contract on the basis of the percentage of the contract that is actually completed.  Accordingly, respondent's alternative position adjusted petitioner's gross receipts and cost of goods sold figures for the Petromaxx and Amber SPAs on the basis of the percentage that the contracts were completed in 2009 and 2010.

To determine the percentages of the Petromaxx and Amber SPAs that were completed, respondent used the schedule of contracts petitioner had provided; in accordance with section 460(b), respondent added the annual expenses petitioner had actually incurred and then divided those totals by the estimated total contract costs.  For 2009 respondent determined that petitioner had completed approximately 84.23% of the Petromaxx SPA[18] and approximately 34.33% of the Amber SPA,[19] and for 2010 respondent determined that petitioner had completed

---

[17](...continued)
face of the notice of deficiency.

[18]Petitioner had incurred $82,375,539 of actual expenses between 2005 and 2009.  Petitioner estimated the total contract costs to amount to $97.8 million.  Actual expenses of $82,375,539 divided by an estimated total contract cost of $97.8 million equals 84.23%.

[19]Petitioner had incurred $27,805,789 of actual expenses between 2005 and 2009.  Petitioner estimated the total contract costs to amount to $81 million.

(continued...)

[*29] approximately 84.39% of the Petromaxx contract and approximately 34.36% of the Amber contract.

Respondent then multiplied the percentage each contract was completed by the estimated total contract price to arrive at the amounts petitioner should have recognized as income had it accounted for the contracts using the percentage of completion method of accounting. For 2009 respondent adjusted petitioner's gross receipts by $137,644,475.[20] Because petitioner did not report any income or expenses from the Petromaxx or Amber contract from 2005 to 2009, the 2009 adjustment accounts for all income that petitioner should have recognized between

_____

[19](...continued)
Actual expenses of $27,805,789 divided by an estimated total contract cost of $81 million equals 34.33%.

[20]For the Petromaxx SPA, respondent multiplied the $122,250,000 estimated total contract price by an 84.23% completion percentage to arrive at a $102,971,175 gross receipts adjustment for income from the Petromaxx SPA from 2005 to 2009. For the Amber SPA, respondent multiplied the $101 million estimated total contract price by a 34.33% completion percentage to arrive at a $34,673,300 gross receipts adjustment. In total, these adjustments amount to $137,644,475.

[*30] 2005 and 2009 under the percentage of completion method of accounting.[21]

For 2010 respondent adjusted petitioner's gross receipts by $225,900.[22]

Respondent allowed corresponding adjustments for cost of goods sold and made an adjustment for a section 481(b) limitation credit for 2009 to further reduce petitioner's tax liability. The adjustments in the notice of deficiency give rise to the deficiencies and penalties currently at issue. Petitioner challenges the deficiencies and penalties, arguing that it was entitled to account for the Petromaxx and Amber SPAs using the completed contract method of accounting. As of the date of the notice of deficiency, August 22, 2013, petitioner had neither

---

[21]Following a change of accounting method, the Commissioner may make any necessary adjustments to prevent taxable income from being duplicated or omitted as a result of the change under sec. 481(a). For purposes of sec. 481(a) adjustments, once there has been a change in the method of accounting, no statute of limitations applies to the Commissioner's authority to correct errors on old tax returns. See Mingo v. Commissioner, 773 F.3d 629, 636 (5th Cir. 2014), aff'g T.C. Memo. 2013-149.

[22]For the Petromaxx SPA, respondent multiplied the $122,250,000 estimated total contract price by an 84.39% completion percentage to arrive at $103,166,775. After subtracting the gross receipts adjustment for 2009 of $102,971,175 respondent arrived at a total adjustment for the Petromaxx SPA of $195,600 for 2010. For the Amber SPA, respondent multiplied the $101 million estimated total contract price by a 34.36% completion percentage to arrive at $34,703,600. After subtracting the gross receipts adjustment for 2009 of $34,673,300 respondent arrived at a total adjustment for the Amber SPA of $30,300 for 2010. These adjustments total $225,900.

[*31] reported any of the Petromaxx or Amber contract income nor claimed deductions for any of the contract expenses.

OPINION

I.      Burden of Proof

Generally, the Commissioner's determinations set forth in a notice of deficiency are presumed correct, and the taxpayer bears the burden of showing the determinations are in error.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  If a taxpayer's method of accounting does not clearly reflect income, section 446(b) allows the Commissioner to change the taxpayer's method of accounting to one that does clearly reflect income.  The Commissioner is granted broad discretion in determining whether an accounting method clearly reflects income, and that determination is entitled to more than the usual presumption of correctness.  See Commissioner v. Hansen, 360 U.S. 446, 467 (1959); The Howard Hughes Co., LLC v. Commissioner, 142 T.C. 355, 376, aff'd, 805 F.3d 175 (5th Cir. 2015); Shea Homes, Inc. v. Commissioner, 142 T.C. 60, 84 (2014), aff'd, 834 F.3d 1061 (9th Cir. 2016).  The question of whether a particular accounting method clearly reflects income is a question of fact to be determined on a case-by-case basis.  See The Howard Hughes Co., LLC v. Commissioner, 142 T.C. at 376;

**[*32]** <u>Shea Homes, Inc. v. Commissioner</u>, 142 T.C. at 85; <u>Ansley-Sheppard-Burgess Co. v. Commissioner</u>, 104 T.C. 367, 371 (1995).

To prevail, the taxpayer must establish that the Commissioner abused his discretion in changing the method of accounting. <u>Mingo v. Commissioner</u>, 773 F.3d 629, 635 (5th Cir. 2014), <u>aff'g</u> T.C. Memo. 2013-149; <u>The Howard Hughes Co., LLC v. Commissioner</u>, 142 T.C. at 376; <u>Shea Homes, Inc. v. Commissioner</u>, 142 T.C. at 85. The taxpayer bears a heavy burden of proof, and the Commissioner's determination is not to be set aside unless shown to be plainly arbitrary. <u>Mingo v. Commissioner</u>, 773 F.3d at 635; <u>Ansley-Sheppard-Burgess Co. v. Commissioner</u>, 104 T.C. at 370-371 (citing <u>Thor Power Tool Co. v. Commissioner</u>, 439 U.S. 522, 532-533 (1979)). But the Commissioner may not change a taxpayer's method of accounting from an incorrect method to another incorrect method; nor may the Commissioner change a taxpayer's method of accounting where a taxpayer's method of accounting is clearly an acceptable method and clearly reflects income. <u>The Howard Hughes Co., LLC v. Commissioner</u>, 142 T.C. at 376; <u>Shea Homes, Inc. v. Commissioner</u>, 142 T.C. at 85.

II.    <u>Long-Term Contracts</u>

Section 460 governs how taxpayers report income from long-term contracts. Section 460(f)(1) defines a long-term contract as "any contract for the

[*33] manufacture, building, installation, or construction of property if such contract is not completed within the taxable year in which such contract is entered into." The Amber and Petromaxx SPAs were both for the "manufacture, building, installation, or construction of property", and neither contract was completed within the taxable year in which it was entered into. Thus, the contracts are long-term contracts under section 460.

A.     Percentage of Completion Method

Generally, taxpayers who receive income from long-term contracts must account for that income using the percentage of completion method of accounting. Sec. 460(a). This method essentially requires a taxpayer to recognize income and expenses throughout the duration of a contract. See sec. 460(b); see also The Howard Hughes Co., LLC v. Commissioner, 142 T.C. at 382; Shea Homes, Inc. v. Commissioner, 142 T.C. at 85. As argued here, however, two exceptions to this rule may apply: section 460(f)(2) excludes certain manufacturing contracts and section 460(e)(1)(B) excludes certain construction contracts. As discussed infra, the Court need not determine whether the Petromaxx and Amber SPAs are for manufacturing or construction because neither exception applies; section 460 requires petitioner to use the percentage of completion method of accounting for both contracts.

**[*34]** B.    <u>Exception for Certain Manufacturing Contracts</u>

Respondent's primary position is that the Petromaxx SPA is a manufacturing contract and that it fails to meet the section 460(f)(2) requirements to be treated as a long-term contract. Accordingly, respondent asserts, petitioner is required to use the accrual method of accounting. Petitioner disagrees, arguing that section 460(f)(2) is inapplicable because the contracts are construction contracts--not manufacturing contracts.

Manufacturing contracts are generally not treated as long-term contracts, meaning the long-term contract accounting rules of section 460 would not apply. <u>See</u> sec. 460(f)(2). However, if a contract involves the manufacture of (A) any unique item of a type not normally included in the finished goods inventory of the taxpayer or (B) any item which normally requires more than 12 calendar months to complete, then the contract is treated as a long-term contract and is subject to section 460. <u>See</u> sec. 460(f)(2)(A) and (B).

At issue are two contracts--each for the disassembly, transportation, refurbishing, assembly, and certification of a new oil refinery. Petitioner introduced sufficient evidence, corroborated by the testimony of Mr. Balke, showing that the processes involved normally require more than 12 calendar months to complete. Respondent's expert, Mr. Harris, agreed, stating that the

[*35] assembly process alone "could hardly be expected in less than one year." Assuming without finding that these contracts are for the manufacture of two oil refineries, each would fall under the section 460(f)(2)(B) requirement that it be treated as a long-term contract under section 460 and thus generally accounted for using the percentage of completion method of accounting.

The Commissioner may not change a taxpayer's method of accounting from an incorrect method to another incorrect method. The Howard Hughes Co., LLC v. Commissioner, 142 T.C. at 376; Shea Homes, Inc. v. Commissioner, 142 T.C. at 85. Because the evidence clearly establishes that even if the Petromaxx SPA were a manufacturing contract, the length of the contract would render section 460(f)(2) properly applicable and would generally require petitioner to use the percentage of completion method of accounting, the Court finds respondent's manufacturing position for the Petromaxx SPA incorrect.

C.     Exception for Certain Construction Contracts

In some instances taxpayers may account for income from certain construction contracts under a method of accounting other than the percentage of completion method, such as the completed contract method. See sec. 460(e); The Howard Hughes Co., LLC v. Commissioner, 142 T.C. at 382. Section 460(e)(1)(B) provides an exception to the percentage of completion method of

[*36] accounting for certain long-term contracts that meet the following requirements: (1) the contract is a construction contract; (2) the taxpayer estimates, at the time the contract is entered into, that it will be completed within the two-year period beginning on the contract commencement date (the two-year rule); and (3) the taxpayer's average annual gross receipts for the three taxable years preceding the taxable year in which the contract is entered into do not exceed $10 million. A taxpayer who satisfies all three requirements is eligible to account for such a contract using the completed contract method of accounting; failure to meet any one of the three requirements will render the exception inapplicable.[23]

Petitioner accounted for the Petromaxx and Amber SPAs using the completed contract method. Respondent determined that petitioner was ineligible to use the completed contract method. The parties disagree over whether (1) the contracts were "construction contracts" under section 460 and (2) the two-year rule was satisfied. Assuming without finding that these contracts are construction contracts, and bearing in mind the well-settled principle that statutes granting tax exemptions or deferments must be strictly construed, see The Howard Hughes

_____

[23]Sec. 460(e)(1)(A) provides an additional exception to the percentage of completion method of accounting for home construction contracts. Petitioner does not contend that it qualifies for this exception.

**[\*37]** <u>Co., LLC v. Commissioner</u>, 805 F.3d at 181, the Court finds that petitioner did not satisfy the two-year rule with respect to either contract. Petitioner, therefore, was not eligible to account for the Petromaxx or Amber SPA using the completed contract method of accounting.

III. <u>Two-Year Rule</u>

    A.    <u>Legal Framework</u>

To be eligible for the construction contract exception to the percentage of completion method, the taxpayer must estimate, at the time the contract is entered into, that it will be completed within the two-year period beginning on the contract commencement date. <u>See</u> sec. 460(e)(1)(B)(i). The statute requires the Court to first determine the contract commencement dates of the Petromaxx and Amber SPAs and then determine whether petitioner could have reasonably estimated--at the time the respective contracts were entered into--that the projects would be complete within two years from their respective commencement dates. Sec. 460(e)(1)(B); <u>see also</u> sec. 1.460-1(f)(4), Income Tax Regs.

        1.    <u>Contract Commencement Date</u>

For purposes of section 460, the term "contract commencement date" means the first date on which any costs (other than bidding expenses or expenses incurred in connection with negotiating the contract) allocable to the contract are

**[\*38]** incurred.[24]  Sec. 460(g); sec. 1.460-1(b)(7), Income Tax Regs.  A cost is

"incurred" for the taxable year in which all the events have occurred that establish

the fact of the cost, the amount of the cost can be determined with reasonable

accuracy, and economic performance has occurred with respect to the cost.  Sec.

1.460-1(b)(8), Income Tax Regs. ("Incurred has the meaning given in § 1.461-

1(a)(2) (concerning the taxable year a liability is incurred under the accrual

method of accounting), regardless of a taxpayer's overall method of accounting.").

### 2.    Two-Year Estimate

With respect to estimating the length of a contract under section 460,

section 1.460-1(f)(4)(i), Income Tax Regs., provides:

> A taxpayer must use a reasonable estimate of the time required to
> complete a contract when necessary to classify the contract (e.g., to
> determine whether * * * the two-year completion rule for exempt
> construction contracts * * * is satisfied * * *).  To be considered
> reasonable, an estimate of the time required to complete the contract
> must include anticipated time for delay, rework, change orders,
> technology or design problems, or other problems that reasonably can
> be anticipated considering the nature of the contract and prior
> experience.  A contract term that specifies an expected completion or
> delivery date may be considered evidence that the taxpayer

---

[24]The contract commencement date is not necessarily the same date as the
date that the contract is entered into.  The regulations provide separate definitions
for the two times.  Secs. 1.460-1(b)(7) (defining contract commencement date),
(c)(2) (defining the date that the contract is entered into), Income Tax Regs.  And
para. (c)(2) contemplates situations where a taxpayer attempts to change his
Federal tax consequences through creative scheduling of these dates.

**[*39]** reasonably expects to complete or deliver the subject matter of the contract on or about the date specified, especially if the contract provides bona fide penalties for failing to meet the specified date. If a taxpayer classifies a contract based on a reasonable estimate of completion time, the contract will not be reclassified based on the actual (or another reasonable estimate of) completion time. A taxpayer's estimate of completion time will not be considered unreasonable if a contract is not completed within the estimated time primarily because of unforeseeable factors not within the taxpayer's control, such as third-party litigation, extreme weather conditions, strikes, or delays in securing permits or licenses.

Section 1.460-1(f)(4)(i), Income Tax Regs., provides that the taxpayer's estimate of the time required to complete a contract must be "reasonable". Where, as here, the parties disagree as to whether the two-year rule for exempt construction contracts has been satisfied, the Court will consider all of the facts and circumstances of a particular case to determine whether the taxpayer's estimate was reasonable. Further, the Court must look back to the time the contract was entered into to decide whether the estimate was reasonable. See sec. 460(e)(1)(B)(i).

Often, a written contract objectively manifests the taxpayer's expectations at the time the taxpayer enters into the contract. However, the regulations do not require the Court to make its determination with respect to the two-year rule on the basis of the contract alone, and the dates specified in the contract are not dispositive. See sec. 1.460-1(f)(4)(i), Income Tax Regs. ("A contract term that

**[*40]** specifies an expected completion or delivery date <u>may</u> be considered evidence that the taxpayer reasonably expects to complete or deliver the subject matter of the contract on or about the date specified[.]" (Emphasis added.)). The facts and circumstances of this case require the Court to make a decision with respect to the two-year rule on the basis of the contracts and the supporting documentation in the record, Mr. Balke's testimony, and Mr. Harris' expert testimony because they are the only evidence available for the Court to consider for both the Petromaxx and Amber SPAs.

    B.    <u>Petromaxx SPA</u>

        1.    <u>Contract Commencement Date</u>

Although petitioner and Petromaxx formally executed the Petromaxx SPA on October 28, 2006, the first date on which petitioner incurred costs allocable to the Petromaxx SPA (other than bidding expenses or expenses incurred in connection with negotiating the contract) was March 22, 2006, when petitioner purchased the Cenco refinery for use in the Petromaxx SPA. Thus, for purposes of section 460, the contract commencement date of the Petromaxx SPA was March 22, 2006. <u>See</u> sec. 460(g); sec. 1.460-1(b)(7) and (8), Income Tax Regs.

**[\*41]**  2.  <u>Two-Year Estimate</u>

a.  <u>Parties' Arguments</u>

The parties disagree as to whether petitioner reasonably estimated that the Petromaxx SPA could have been completed within two years from the contract commencement date of March 22, 2006.  Respondent relies on the terms of the Petromaxx SPA and Mr. Harris' expert testimony that three years is an optimistic estimate of the time required to complete a project similar to the Petromaxx refinery project.  Petitioner contends that its 3-D laser scanning and parallel processing system allowed it to reasonably estimate that the Petromaxx SPA would be completed within two years.  Further, petitioner argues that Mr. Harris did not consider petitioner's parallel processing system when determining how long it would take the parties to complete the Petromaxx refinery project and that he was altogether unfamiliar with parallel processing.

b.  <u>Terms of the Petromaxx SPA</u>

The two-year rule requires the Court to look at petitioner's expectations at the time it entered into the contract.  <u>See</u> sec. 460(e)(1)(B).  While dates specified in a contract are not dispositive, the Court will first look to the terms of the Petromaxx SPA to help determine petitioner's expectations at the time it entered into the SPA, October 28, 2006.

**[*42]**  Section 1.460-1(f)(4)(i), Income Tax Regs., provides that a contract term that specifies an expected completion or delivery date may be considered evidence that the taxpayer reasonably expects to complete or deliver on or about that date, especially if the contract provides bona fide penalties for failing to meet the specified date.  The only provision in the Petromaxx SPA that references a specific date is with respect to petitioner's delivery obligations.  Petitioner was to "use its best efforts" to deliver the last unit by April 30, 2007, but failure to do so would not result in penalties; rather, petitioner would only default under the Petromaxx SPA if it failed to deliver the last unit by September 12, 2007.  The Petromaxx SPA references a project schedule.  However, the project schedule attached to the Petromaxx SPA stated only "[to be provided by BASIC]"; the remainder of the page was blank, and petitioner did not introduce into evidence any documents that purport to be a project schedule.

Petitioner's contractual obligations were not complete upon delivery of the last refurbished unit.  The parts then had to be shipped from Texas to Bulgaria and assembled according to petitioner's detailed modeling, and the newly assembled refinery had to be commissioned under petitioner's supervision and a final acceptance report and certificate obtained upon successful testing.  Only then would petitioner's contractual obligations be fulfilled.  And the Petromaxx

**[*43]** SPA did not specify dates by when these remaining obligations were to be complete.

Respondent introduced an expert witness report into evidence. In that report Mr. Harris estimated how long the remaining components of the Petromaxx refinery project would take, i.e., how long it would take to ship the delivered units from Texas to Bulgaria; how long it would take to assemble the refinery once Petromaxx was in possession of all of the equipment; and how long it would take to commission and performance test the newly assembled refinery. Mr. Balke agreed with Mr. Harris' conclusions to the extent they were based on traditional industry practices.

Once petitioner delivered the final unit, Petromaxx had to ship the units to Bulgaria; Mr. Harris opined that six months was an optimistic estimate of only the time required to ship the units to Bulgaria, which did not include the time required to assemble the new refinery. Once Petromaxx acquired all of the equipment, it had to assemble the refinery; Mr. Harris estimated that the assembly process alone "could hardly be expected in less than one year." Once Petromaxx assembled the refinery, petitioner was required to supervise the commissioning process; Mr. Harris estimated that the commissioning process would take six weeks. After the commissioning process was complete, a qualified engineer was to conduct

**[\*44]** performance tests and issue a final report upon successful testing; Mr. Harris estimated that performance testing would take approximately one month. At that point petitioner would have finally completed all of its obligations under the Petromaxx SPA.

Even if the Court concludes that April 30, 2007 (the best efforts date)--and not September 12, 2007 (the default date)--is the relevant delivery date despite the Petromaxx SPA's not calling for penalties if petitioner did not deliver the units by then, the Petromaxx project still could not have been completed within two years from March 22, 2006, the contract commencement date. The time between the contract commencement date and the best efforts date was 13 months; once the units were delivered, it would take 6 months to ship them from Texas to Bulgaria. Upon receipt of all of the units, it would take Petromaxx 12 months to assemble the refinery; and once the refinery was assembled, it would take approximately 2-1/2 months to commission and conduct performance tests. In total, a project similar to the Petromaxx refinery project would take over 33 months to complete using traditional industry practices.

The Petromaxx SPA indicates that petitioner and Petromaxx anticipated the final payment's becoming due on the earlier of: (1) 10 months after the "Final Delivery Date", which the Petromaxx SPA defined as September 12, 2007, or (2)

[*45] the "Final Acceptance Date", which was defined as the date on which the qualified engineer issued a completion certificate.[25] Assuming traditional industry practices, this provision puts the completion date more than two years after the contract commencement date. The Petromaxx SPA does not require the qualified engineer to issue a completion certificate by a certain date, and 10 months after the September 12, 2007, "Final Delivery Date" is July 12, 2008, which is more than two years after the March 22, 2006, contract commencement date.

Under section 1.460-1(f)(4)(i), Income Tax Regs., dates specified in the Petromaxx SPA are not dispositive in determining whether petitioner, at the time it entered into the Petromaxx SPA, could have reasonably expected to complete the Petromaxx project within two years from its commencement date. Accordingly, the Court will next consider Mr. Balke's testimony.

c.    Mr. Balke's Testimony

Petitioner acknowledges the lack of specificity in the Petromaxx SPA and the lack of formal documentation such as a project schedule but argues that the "parties intended for Petromaxx to begin building the * * * [refinery]

---

[25]Although this provision of the Petromaxx SPA refers to terms of payment and not performance, i.e., refurbishing, shipping, constructing the refinery, commissioning, or performance testing, the Court will address this terms of payment provision for the sake of completeness.

[*46] infrastructure while Petitioner was refurbishing the refinery" even though the Petromaxx SPA is silent on the matter.[26]

The Petromaxx SPA is governed by Austrian law, including the United Nations Convention on Contracts for the International Sale of Goods (CISG), Apr. 11, 1980, 1489 U.N.T.S. 59.[27] The CISG embodies a liberal approach to contract

---

[26]Specifically, petitioner's reply brief states:

As is apparent from the contracts themselves and the testimony at trial, Petitioner operates in a flexible and informal manner; the lack of formal documentation of a project schedule does not prove that the parties did not have an understanding that the * * * [refinery site] should be completed while the refinery is being refurbished, simultaneously instead of subsequently. Petitioner offered testimony as a fact witness, under oath, which is the best available evidence of its customary business practices. Mr. Balke has established his criteria as an experienced professional in his line of work. His testimony is supported by the efforts taken by Petitioner to provide specifications to Petromaxx using laser imaging at considerable cost to Petitioner. Procuring those images immediately and providing such images at an unusually early stage in the construction process corroborates the testimony that the parties intended for Petromaxx to begin building the * * * [refinery] infrastructure while Petitioner was refurbishing the refinery.

[27] CISG art. 1(1) "applies to contracts of sale of goods between parties whose places of business are in different States: (a) when the States are Contracting States; or (b) when the rules of private international law lead to the application of the law of a Contracting State." For purposes of the CISG, a party's place of business is the one having "the closest relationship to the contract and its performance, having regard to the circumstances known to or contemplated by the parties at any time before or at the conclusion of the contract." Id. art. 10(a).

(continued...)

**[*47]** interpretation.  Under the CISG a contract of sale may be proven by any

means, including witnesses; it need not be evidenced by writing and is not subject

to any other requirement as to form.  Id. art. 11.  Article 8 of the CISG provides:

> (1)  For the purposes of this Convention statements made by and other conduct of a party are to be interpreted according to his intent where the other party knew or could not have been unaware what the intent was.
>
> (2)  If the preceding paragraph is not applicable, statements made by and other conduct of a party are to be interpreted according to the understanding that a reasonable person of the same kind as the other party would have had in the same circumstances.
>
> (3)  In determining the intent of a party or the understanding a reasonable person would have had, due consideration is to be given to all relevant circumstances of the case including negotiations, any practices which the parties have established between themselves, usages and any subsequent conduct of the parties.

Article 8 of the CISG allows broader standards of evidence outside the

executed documents, including statements made or a party's conduct, to determine

the intent of a party.  Petitioner's position is that even though the Petromaxx SPA

---

[27](...continued)
Under the Petromaxx SPA, Petromaxx's "place of business" for purposes of the CISG is in Bulgaria, as the refinery was to be assembled there.  Petitioner's "place of business" for purposes of the CISG is in the United States, as petitioner refurbished the Cenco refinery parts in the United States.  Both Bulgaria and the United States ratified the CISG.  Thus, the CISG applies because there is a contract for the sale of goods between parties whose places of business are in different contracting States.

**[\*48]** and related documents are silent with respect to anticipated performance dates and parallel processing, petitioner's conduct reflected the parties' intent to implement petitioner's parallel processing system.

Even if the Court looks outside the terms of the Petromaxx SPA and considers statements and conduct of the parties, petitioner did not introduce any such evidence to support Mr. Balke's self-serving testimony that would allow the Court to conclude that the parties in fact agreed to implement a parallel processing system. Petitioner did not introduce any evidence that Petromaxx "knew or could not have been unaware what the intent was" with respect to the project's time line. See CISG art. 8(1). Further, because petitioner's parallel processing system was not the traditional way of operating in the industry, Petromaxx would not have known or had reason to know that it should be performing its contractual obligations simultaneously with petitioner. See id. Petitioner did not introduce any evidence to show that Petromaxx made statements to petitioner or acted as if the parties were conducting operations using a parallel processing system. See id. art. 8(2) and (3). Mr. Balke further testified that he agreed with most of Mr. Harris' conclusions because they were based on traditional practices within the industry. That testimony provides further support to the conclusion that Petromaxx did not have any reason to be aware of petitioner's expectations with

**[*49]** respect to Petromaxx's timing for beginning and completing its contractual obligations.  See CISG art. 8(2) and (3).

Petitioner did not produce any other witnesses, provide the Court with any documentary evidence that would reflect a meeting of the minds between the parties to use a parallel processing system, or even explain how much time parallel processing would save; instead petitioner relied solely on Mr. Balke's unsupported testimony.  Although Mr. Balke has over 30 years of experience in working with oil refineries and refinery equipment, including international dealings, he did not provide a single concrete example of a project similar to the Petromaxx SPA where the parties conducted operations using a parallel processing system and which was complete within two years from its commencement date.[28]  Petitioner's

---

[28]The increased efficiency vel non of the parallel processing system does not rescue petitioner's expectations here.  Assuming without finding that the best efforts date is the relevant date, the two-year clock began running on March 22, 2006; the best efforts date was April 30, 2007; the parts needed to be transported from Texas to Bulgaria, taking six months; and commissioning and testing the refinery required an additional 2-1/2 months--leaving slightly more than two months until the end of the two-year period for Petromaxx to assemble the refinery according to petitioner's detailed models.  And respondent's expert found that through the use of traditional industry techniques, reassembly might be attained in 12 months.  As discussed supra, none of these projections account for delay, rework, or technology or design problems caused by implementing a new 3-D scanning and modeling process.  See sec. 1.460-1(f)(4)(i), Income Tax Regs.  Therefore, even if parallel processing could reduce a one-year construction project to approximately two months, a reasonable estimate necessarily requires inclusion

(continued...)

**[\*50]** actions of purchasing the Cenco refinery and beginning the refurbishing process do not prove the intent or knowledge of Petromaxx to equally perform its responsibilities. Petitioner simply has not introduced sufficient evidence to show that its expectations with respect to the Petromaxx refinery project's timeframe differed from those projected by Mr. Harris according to traditional industry practices or objectively manifested in the Petromaxx SPA.

### d. Conclusion

The Commissioner is granted broad discretion in determining whether an accounting method clearly reflects income, and that determination is entitled to more than the usual presumption of correctness. Commissioner v. Hansen, 360 U.S. at 467; The Howard Hughes Co., LLC v. Commissioner, 142 T.C. at 376; Shea Homes, Inc. v. Commissioner, 142 T.C. at 84. Petitioner simply has not met its burden to prove that respondent's determination was clearly arbitrary.

Respondent's position that petitioner did not reasonably estimate that the Petromaxx refinery project could be completed within two years is supported by the documentation that is available for the Court to review, primarily the

---

[28](...continued)
of time for such unanticipated issues. Id. Petitioner offered no explanation other than the unsupported testimony of Mr. Balke that he believed the contract could have been completed within two years.

[*51] Petromaxx SPA and its amendments, and by Mr. Harris' expert testimony. Petitioner attempts to rebut respondent's determination with Mr. Balke's testimony. However, petitioner did not introduce any other evidence to support Mr. Balke's testimony, and the Court is not required to accept self-serving testimony as true. The Court concludes that petitioner did not meet its burden in proving that, at the time it entered into the Petromaxx SPA, it reasonably believed the contract would be completed within two years from its commencement date. Accordingly, petitioner was not eligible to report income from the Petromaxx SPA using the completed contract method of accounting.

### C. Amber Contract

#### 1. Contract Commencement Date

Petitioner and Amber executed the Amber SPA on July 17, 2008. The first date on which petitioner incurred costs allocable to the Amber SPA (other than bidding expenses or expenses incurred in connection with negotiating the contract) was July 24, 2008, when petitioner purchased the Ataş refinery from Toplam for use in the Amber SPA. Thus, for purposes of section 460, the contract commencement date of the Amber SPA was July 24, 2008. See sec. 460(g); sec. 1.460-1(b)(7) and (8), Income Tax Regs.

**[\*52]**  2.  <u>Two-Year Estimate</u>

    a.  <u>Parties' Arguments</u>

As was the case with the Petromaxx SPA, the parties disagree whether petitioner reasonably estimated that the Amber SPA could have been completed within two years from the contract commencement date of July 24, 2008. Respondent argues that the terms of the Amber SPA itself show that petitioner did not reasonably expect the SPA to be completed within two years. Respondent also relies on Mr. Harris' expert testimony that 4-1/2 years is an optimistic estimate of the time required to complete a project similar to the Amber refinery project. Petitioner again argues that its 3-D laser scanning and parallel processing system allowed it to reasonably estimate that the Amber SPA would be completed within two years and that Mr. Harris did not consider petitioner's parallel processing system when determining how long it would take the parties to complete the Amber refinery project.

    b.  <u>Terms of the Amber SPA</u>

While the dates specified in a contract are not dispositive, the Court will first look to the terms of the Amber SPA to help determine petitioner's expectations at the time it entered into the agreement. The Amber SPA is governed by Texas law, including Article 2 of the Uniform Commercial Code

[*53] (UCC). Under Texas law, interpreting a written contract is primarily a matter of "ascertain[ing] the * * * intentions of the parties as expressed in the instrument." Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983). A threshold issue in contract interpretation is whether the contract is ambiguous. A contract is ambiguous if the terms used are reasonably susceptible of more than one meaning. See id.

Where an unambiguous writing has been entered into between parties, the courts will give effect to the parties' intention as expressed or apparent in the writing. City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515, 518 (Tex. 1968). In the usual case the instrument alone will be deemed to express the intention of the parties for it is objective, not subjective, intent that controls. Id. Generally, the parties to a contract intend every clause to have some effect and in some measure to evidence their agreement. Id. All parts of a contract are to be taken together, and such meaning shall be given to them as will carry out and effect to the fullest extent the intention of the parties. Id. at 519.

The terms of the Amber SPA are not ambiguous. While the Amber SPA is silent with respect to many anticipated performance dates, there is a significant legal difference between ambiguous contracts and silent contracts. See Thompson v. CPN Partners, LP, 23 S.W.3d 64, 71 (Tex. App. 2000). The only term in the

[*54] Amber SPA that references a specific date is with respect to petitioner's delivery obligations; the Amber SPA clearly states that petitioner was required to deliver the last unit to a specified site in Turkey[29] by November 15, 2010, approximately 28 months after the July 24, 2008, contract commencement date. If petitioner failed to deliver by November 15, 2010, petitioner was subject to penalties; if petitioner delivered the last unit before November 15, 2010, it was entitled to bonus payments.

Taken together, the delivery date and the potential penalties and bonus payments indicate that the parties intended November 15, 2010, to be the approximate date by which petitioner would deliver the last unit. This delivery date occurred more than two years after the contract commencement date--July 24, 2008--and Amber still had to transport the refurbished parts from Turkey to Pakistan, construct the refinery, and commission and performance test the newly assembled refinery before petitioner would have satisfied its contractual obligations.

---

[29]The Amber SPA reserved the right to determine the final location of the refinery, but at the time of executing the SPA, a location in Pakistan was the target.

**[\*55]**  Because the dates specified in the Amber SPA are not dispositive with respect to the two-year rule, <u>see</u> sec. 1.460-1(f)(4)(i), Income Tax Regs., the Court will next consider Mr. Balke's testimony.

### c.      Mr. Balke's Testimony

Although the terms of the Amber SPA do not reference parallel processing or specific dates by which the refinery had to be assembled, commissioned, and performance tested, petitioner argues that the November 15, 2010, delivery date was an arbitrary date selected by the parties and that the parties intended to implement petitioner's parallel processing system, which would have allowed the Amber SPA to be completed within "about 18 to 24 months."

Petitioner relies only on Mr. Balke's unsupported testimony; petitioner did not produce any other witnesses, provide the Court or respondent with documentary evidence that would reflect the parties' intent to use a parallel processing system,[30] produce any evidence to show that the parties' conduct reflected an intent to conduct operations using a parallel processing system, or even explain exactly how much time parallel processing would save.  Even if the

---

[30]Unlike the Petromaxx SPA, which did not reference 3-D laser scanning and modeling, the Amber SPA specifically refers to 3-D laser scanning and modeling.  However, like the Petromaxx SPA, the Amber SPA does not mention parallel processing or address the purchaser's obligations under such a system.

[*56] Court assumes that the parties would be completing their tasks simultaneously, petitioner did not prove that parallel processing would allow the parties to complete the contract within two years.

Although Mr. Balke has over 30 years of experience in working with oil refineries and refinery equipment, including international dealings, he did not provide a single concrete example of a project similar to the Amber refinery project where the parties conducted operations using a parallel processing system and completed it within two years from its commencement date. And there is no indication that Mr. Balke's projections took into account any unanticipated delays. See id. Petitioner simply has not introduced sufficient evidence to show that its expectations with respect to the Amber refinery project's timeframe differed from those objectively manifested in the Amber SPA.[31]

### d.    Conclusion

As with the Petromaxx refinery project, petitioner has not met its burden to prove that respondent's determination regarding the Amber refinery project was arbitrary. Respondent's position that petitioner could not have reasonably estimated that the Amber refinery project would be completed within two years is supported by the terms of the Amber SPA; on its face, the Amber SPA called for a

---

[31]The parties canceled the Amber SPA on January 18, 2010.

[*57] delivery date more than two years after the Amber SPA commencement date. Even if the Court considers Mr. Balke's self-serving testimony, petitioner did not provide any evidence to support his testimony. The Court concludes that petitioner did not meet its burden in proving that, at the time it entered into the Amber SPA, it reasonably expected the contract to be complete within two years from its commencement date. Accordingly, petitioner was not eligible to report income from the Amber project using the completed contract method of accounting.

IV.    Section 6662(a) Accuracy-Related Penalties

Section 6662(a) and (b)(1) and (2) imposes a 20% accuracy-related penalty with respect "to any portion of an underpayment of tax required to be shown on a return" if that underpayment is due to, among other things, negligence or a substantial understatement of income tax. An accuracy-related penalty does not apply to any portion of an underpayment of tax for which the taxpayer had reasonable cause and acted in good faith. See sec. 6664(c)(1).

Section 6662(b)(2) imposes a 20% penalty on any underpayment attributable to any "substantial understatement of income tax." An "understatement" generally is the excess of the amount of tax required to be shown on the return over the amount of tax that is actually shown on the return. Sec.

[*58] 6662(d)(2)(A). For a C corporation, an understatement is "substantial" if it exceeds the lesser of 10% of the tax required to be shown on the tax return (or, if greater, $10,000) or $10 million. Sec. 6662(d)(1)(B). Under section 7491(c), the Commissioner bears the burden of production with regard to penalties for individual taxpayers, Higbee v. Commissioner, 116 T.C. 438, 446 (2001), but section 7491(c) does not apply where, as here, the taxpayer is a corporation, NT, Inc. v. Commissioner, 126 T.C. 191, 194 (2006).

Petitioner substantially understated its income tax for both 2009 and 2010, reporting zero tax liability for each of those years. And there is no disagreement that under either of respondent's alternative positions, the amount of tax required to be shown exceeds $10,000 for each year. Therefore, the Court will look next to whether petitioner has shown that it is not liable for the penalty because of reasonable cause. Rule 142(a); see Higbee v. Commissioner, 116 T.C. at 447.

Petitioner argues that it is not liable for the 20% accuracy-related penalty because, in view of the complexity of section 460 and the accompanying regulations, it made a good-faith effort to comply.

In general the accuracy-related penalty does not apply to any portion of an underpayment of tax if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith. Sec. 6664(c)(1). The determination of

[*59] whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all of the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Generally, the most important factor is the extent of the taxpayer's effort to assess his or her proper tax liability. Id.

Reasonable cause requires that the taxpayer exercised ordinary business care and prudence as to the disputed item. United States v. Boyle, 469 U.S. 241, 246 (1985). It can be shown through reasonable reliance on professional advice on matters beyond a layperson's understanding:

> When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. * * *

Id. at 251; Graev v. Commissioner, 147 T.C. __, __ (slip op. at 39-40) (Nov. 30, 2016); Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), aff'd on another issue, 904 F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991).

[*60] Petitioner used the services of the same CPA from at least 2005 through 2010. However, the only evidence of petitioner's reliance upon professional advice rendered by its CPA is the fact that its Federal income tax returns were filed. Nothing in the record indicates that petitioner either requested of or received from its CPA advice regarding the application of the long-term contract exception under section 460(e) to the Petromaxx or Amber SPAs. Based on the absence of evidence indicating that petitioner even addressed this issue with its CPA, the Court cannot find that it exercised ordinary business care and prudence here.

Circumstances that may also indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in the light of all the facts and circumstances, including the experience, knowledge, and education of the taxpayer. Higbee v. Commissioner, 116 T.C. at 449; sec. 1.6664-4(b)(1), Income Tax Regs.

As discussed at length supra, the Court has found unreasonable petitioner's alleged belief, at the time it entered into the Petromaxx and Amber SPAs, that either contract could be completed within two years. Despite his extensive experience in working with both domestic and international oil refinery projects, Mr. Balke did not provide any concrete examples of previous projects that he had

[*61] worked on to support his claim that he thought the Petromaxx and Amber SPAs could be completed within two years, and he agreed with Mr. Harris' estimates with respect to each project's duration to the extent they were based on traditional industry practices.

Although the regulations state that dates identified in a contract are not dispositive to the Court's analysis, sec. 1.460-1(f)(4)(1), Income Tax Regs., petitioner could have controlled--at least to some extent--the various performance dates that were specified in the SPAs. If petitioner believed that it would deliver the last refurbished unit before the delivery dates specified, it could have provided so in the SPAs themselves. Petitioner could have required Amber and Petromaxx to ship the refurbished units by a certain date, complete the refinery site by a specific date, complete assembly by a specific date, and complete commissioning and performance testing by a certain date. However, neither SPA specified those anticipated performance dates. The only performance dates specified in the Amber and Petromaxx SPAs were with respect to petitioner's delivery obligations, and those respective dates reflect an expectation of completing each contract within a period exceeding two years.

Although the contracts lacked specific performance dates, petitioner had another opportunity to control completion dates by creating a project schedule.

[*62] Both SPAs referenced project schedules to be provided by petitioner; but the project schedules were not included in the SPAs, and petitioner did not provide the Court or respondent with any separate project schedule. A reasonably prudent taxpayer would have some documentation to support its position; outside of Mr. Balke's testimony, petitioner did not provide the Court or respondent with any evidence that would support its decision to account for the Petromaxx and Amber SPAs using the completed contract method.

For the aforementioned reasons, the Court concludes that petitioner did not act with reasonable cause and in good faith when it accounted for the Petromaxx and Amber SPAs using the completed contract method of accounting. Accordingly, the Court will sustain respondent's determinations with respect to the accuracy-related penalties for 2009 and 2010.[32]

The Court has considered all of the arguments made by the parties, and to the extent they are not addressed herein, they are considered unnecessary, moot, irrelevant, or without merit.

---

[32]Because the Court sustains the sec. 6662(a) accuracy-related penalty on the ground of substantial understatement under sec. 6662(b)(2), the Court does not need to decide whether the penalty should also be sustained on the ground of negligence under sec. 6662(b)(1). Sec. 1.6662-2(c), Income Tax Regs.

**[*63]**  To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.